## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRAND MARKETING GROUP, LLC | ) | Civil Case No.: 12-1572 (AJS) |
| d/b/a THERMABLASTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Honorable Arthur J. Schwab |
| v. | ) | |
| | ) | |
| INTERTEK TESTING SERVICES, N.A. | ) | |
| INC., d/b/a INTERTEK TESTING | ) | JURY TRIAL DEMANDED |
| SERVICES, and CONTINENTAL | ) | |
| APPLIANCES, INC., d/b/a PROCOM | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff, Brand Marketing Group, LLC, d/b/a Thermablaster, by and through its undersigned counsel, brings this Second Amended Complaint against the Defendant Intertek Testing Services NA, Inc., d/b/a Intertek Testing Services and Defendant Continental Appliances, Inc., d/b/a ProCom.[1]

## PARTIES AND BACKGROUND

1.      Plaintiff Brand Marketing Group, LLC, d/b/a Thermablaster ("Brand") is a Delaware limited liability company with its principal place of business in Pittsburgh, Pennsylvania.  Brand imports, markets and sells consumer products, specifically vent free gas room heaters, throughout the United States.

2.      Defendant Intertek Testing Services NA, Inc., d/b/a Intertek Testing Services ("Intertek NA"), is a corporation organized and existing under the laws of the state of Delaware, and has a principal place of business at 3933 US Route 11, Cortland, New

---

[1] Defendant Continental Appliances, Inc., d/b/a ProCom has been dismissed from this lawsuit.

York 13045.  Intertek NA is a subsidiary corporation of Intertek Group, PLC ("Intertek Group"), a multinational inspection, product testing and certification company headquartered in London, United Kingdom.  Intertek Group and its subsidiaries provide services through a network of more than 1,000 laboratories across 100 countries including the United States and China.  By way of further background Intertek Group maintains a testing laboratory located in Guangzhou, China ("GZ Laboratory") where a part of the services at issue in this matter took place.

3.     Intertek NA engages in testing, inspection and certification of products and commodities to, primarily, North American safety standards.  By its own Certification Agreement- the contract Intertek NA requires customers to sign prior to performing inspection and certification services- Intertek NA represents that it "provides a service for evaluating whether products provided by the Manufacturer comply with designated standards or specified requirements."  Section 2.1 of the Certification Agreement states "Testing and Evaluation.  [Intertek NA] is an independent laboratory providing testing and evaluation services to determine whether representative samples of a Product comply with designated national and international standards, specifications, and/or codes."

4.     Intertek NA represents that it and/or the laboratory where testing occurs, in this case the GZ laboratory, will perform the applicable testing accurately.

5.     Intertek NA represents that it and/or the GZ laboratory, has sufficient experience, training and knowledge to properly and adequately provide the applicable product testing and evaluation services.

6.     Customers, in the course of their business, rely on Intertek NA's and/or the laboratory where testing occurs, in this case the GZ laboratory, representation that it can properly and adequately perform the applicable product testing and evaluation services.

7.     Intertek NA knows and recognizes that certain third parties, such as buyers, wholesalers, and distributors of its customers' products, in the course of their business, rely on Intertek NA's representation that it can properly and adequately perform the applicable product testing and evaluation services.

8.     Generally, with respect to its product testing services, once a customer has entered into or renewed an existing Certification Agreement for product testing, the customer sends samples of the product to Intertek NA  and/or the laboratory where testing occurs, in this case the GZ laboratory.  Engineers then perform a series of tests on the product that cover the requisite facets of the applicable standard.  The tests are performed according to written protocols developed by Intertek NA and/or its laboratories, based upon the applicable standard.

9.     In the event that a product is found not to comply with some aspect of the standard tested to, it is customary for Intertek NA's testing engineers to notify the customer.  The customer is then able to modify the design of its product in order to bring it into compliance.  The customer may then resubmit the modified product to Intertek NA for continued testing and certification.

10.     Conversely, when a product is found to comply with all facets of a standard during each phase of testing, it is customary for Intertek NA's testing engineers to advise the customer of compliance.  This practice of compliance notification often occurs prior to Intertek NA's publication of final Test Reports and its Authorization to Mark

("ATM").   The ATM is a written document from Intertek NA that authorizes the customer to apply Intertek NA's ETL Listed Mark ("ETL Mark") certification mark to its product.   Intertek NA, however, knows that customers and, in turn, certain third parties, rely on its engineers preliminary notifications of product compliance in the course of their business.

11.     The ETL Mark is Intertek NA's self-described proof of product compliance to North American safety standards..[2]   Intertek NA advertises that retailers across the United States accept the ETL Mark as proof of product safety. [3]

12.     Defendant Continental Appliances, Inc., d/b/a ProCom ("ProCom") is a corporation organized and existing under the laws of the state of California and has a principal place of business at 660 West Lambert Road, Brea, California 92821.

13.     ProCom engages in the manufacture, sale and distribution of home heaters and hearth products throughout the United States including the state of Pennsylvania including Allegheny County and is a direct competitor of Brand.  ProCom regularly conducts business in, and has continuous and systematic contacts with, the state of Pennsylvania including Allegheny County.

## JURISDICTION AND VENUE

14.     Jurisdiction over this action exists in this Court pursuant to 28 U.S.C. § 1332(a), in that complete diversity of citizenship exists, as described below, and the amount in controversy in this matter exceeds the sum of $75,000.00, exclusive of interest and costs.

---

[2] http://www.intertek.com/marks/etl/
[3] Id.

15.     This lawsuit was removed from the Allegheny County Court of Common Pleas pursuant to 28 U.S.C. §§ 1441 & 1446.  Allegheny County, Pennsylvania is located in the Western District of Pennsylvania of the United States District Court.  Therefore, venue is appropriate in this Court pursuant to 28 U.S.C. § 1441(a).

**FACTUAL ALLEGATIONS**

16.     In 2007 and 2008, Brand created a design for a dual fuel vent free gas wall heater for sale in the United States under the trade name "Thermablaster."

17.     To help meet the varying needs of consumers, Brand's plan was to produce the heaters ("heaters" or "Thermablasters") with a dual fuel propane/natural gas valve and in three sizes- 6,000, 10,000 and 32,000 BTU.

18.     In January of 2009, Brand met with Bob Campo ("Campo"), Head Buyer for Ace Hardware Corporation ("Ace"). Ace is a hardware cooperative based in Oak Brook, Illinois, that provides a centralized purchasing organization to supply its members' franchise stores across the United States.

19.     Each year, Ace conducts product display shows throughout the United States. The shows allow Ace's franchise members to examine, first-hand, the various products in its catalog to determine which items to carry and sell in their respective stores.

20.     Campo, upon seeing a prototype and learning about the Thermablasters, approved the heaters for a March 2009 product display show in Las Vegas, Nevada.  The Las Vegas show afforded Brand the opportunity to display a prototype of the Thermablasters to Ace's franchise owners for potential sale in local stores across the country.

21.  On December 14th, 2010, Brand met with Campo and other Ace representatives at Ace's Sales office wherein Ace indicated an interest in purchasing Brand's heaters.

22.  Brand was and is a seller/distributor and entity that possessed neither engineering nor manufacturing capabilities

23.  Resultantly, in or around this period of time, Brand contacted Winners Manufacturing ("Winners") in China and inquired as to whether Winners could manufacture the heaters for large-scale distribution.  Winners declined but put Brand in contact with and served as liaison to a smaller Chinese manufacturing company, Reecon M & E Co. Ltd., ("Reecon") and its owner Guohong Fu ("Fu").  Reecon had previously manufactured a different type of heater and indicated a capability of manufacturing Brand's Thermablasters.

24.  Subsequently, Reecon agreed to take on full responsibility for the manufacture of the Thermablasters in return for payment by Brand.

25.  Brand, in turn, would sell the Thermablasters manufactured by Reecon in the United States to distributors like Ace.

26.  As part of its manufacturing responsibilities, Reecon advised Brand of the need to have the Thermablasters tested by a third-party certification entity.  Specifically, Brand became aware of the need to have the heaters certified compliant with the applicable ANSI standard, ANSI Z.21.11.2b-2010 ("ANSI standard") that governed dual-fuel unvented room heaters for sale in the United States.

27.  In that regard, Reecon had an existing business relationship with Intertek NA. Specifically, on or about April 1, 2010, Reecon had entered into a Certification

Agreement with Intertek NA related to a separate oil burning heater Reecon had previously manufactured unrelated to Brand.   Intertek NA had executed this initial Certification Agreement on or about July 4, 2010.   A true and correct copy is attached hereto as Exhibit "1".

28.   Upon information and belief, Reecon inquired with Intertek NA regarding its ability to test to the ANSI standard.

29.   Intertek NA represented to Reecon that it could do the testing requested.[4]

30.   Intertek NA represented to Reecon that it would do the testing accurately.[5]

31.   Intertek NA represented to Reecon that it was qualified, experienced and able to test products to the ANSI standard.

32.   At the time of these representations Intertek NA knew that this information would be supplied for the guidance of third parties, including Brand, and/or that Reecon intended to supply the information to third parties, including Brand.

33.   Contrary to its representations, however, *no* laboratory within the Intertek system, including Intertek NA and the GZ laboratory, had, in fact, *ever* before tested a product to the ANSI standard.[6]

34.   Moreover, the engineers that ultimately performed the testing of the ANSI standard lacked sufficient training and experience to properly perform the testing.[7]

35.   In Reecon's decision to have Intertek NA perform the required testing, Reecon and, in turn, Brand, relied on Intertek NA's representation that Intertek NA and/or the GZ

---

[4] See Deposition of Frederick Curkeet; p. 81, ll. 4-7
[5] Id. at p.43, ll. 5-9
[6] Id. at p.57, ll. 6-14
[7] Id. at Exh. 5/ INT 0002843

laboratory, which it was responsible for, was adequately trained, experienced and able to test products to the ANSI standard.

36.     At the time of Intertek NA's representations regarding testing to the ANSI standard, several of Intertek NA's competitors had previously and properly performed testing of other unvented heaters to the ANSI standard.

37.     Upon information and belief, in or around the time of being advised by Intertek NA that it was sufficiently trained, experienced and able to perform testing to the ANSI standard, Reecon, through Fu, renewed its pre-existing Certification Agreement with Intertek NA, this time for testing and certification of the heaters to the ANSI standard.

38.     The Certification Agreement was entered into between Reecon and Intertek NA only.[8]

39.     Intertek NA, then advised Reecon that the testing under the Certification Agreement would be performed at the GZ laboratory.

40.     Under the renewed Certification Agreement, Intertek NA was responsible for the work performed by the GZ laboratory.[9]

41.     It was also Intertek NA's responsibility to make sure that the GZ laboratory was sufficiently trained and experienced to perform the applicable testing.[10]

42.     On or about June 6, 2011, Ace issued an initial set of purchase orders to Brand for a total of 3,980 heaters.

43.     It was both an implied requirement of Brand's purchase order with Ace and industry standard for commercial products, such as the Thermablasters, to be certified compliant with the ANSI standard.

---

[8] See Deposition of Frederick Curkeet; p. 80, ll. 5-8
[9] Id. p. 82 ll.7-14
[10] Id. p. 82 ll. 15-19

44.     As part of the product testing process, Reecon submitted an Application for Performance Testing dated July 3, 2011.  The Application noted that the Applicant was Reecon alone and that Reecon was seeking product testing to the ANSI standard for dual fuel vent free wall heaters. A true and correct copy is attached hereto as "2".

45.     The Application for Performance Testing indicated to Intertek that the trade name of the heaters to be tested was "Reecon, Thermablaster" and that there were three buyers of the product, Brand, TSC and ETC.

46.     As such, Intertek NA knew by July 3, 2011 that its aforesaid representations as well as the information generated and published through its testing services would be relied upon by three, third-party buyers, including Brand in the course of their business.

47.     On or about July 6, 2011, Reecon sent three samples of the Thermablasters to the GZ laboratory for testing.

48.     Intertek NA was responsible for all aspects of the Thermablaster testing conducted by the GZ laboratory, including the testing engineers' qualification, experience and ability to interpret the ANSI standard.

49.     Intertek NA was responsible for the GZ laboratory's test results for the Thermablasters.[11]

50.     The primary testing of the heaters occurred between July 7, 2011 and July 22, 2011.  In carrying out the testing the GZ laboratory engineers relied primarily on two guiding documents, an ITS Construction Review Sheet and Test Data Sheet.  A true and correct copy is attached hereto as Exhibit "3" & "4".[12]

---

[11] See Deposition of Frederick Curkeet, p. 72, ll. 17-22
[12] See INT 0001327-1353 and INT 0000487-0000508

51.     The GZ laboratory engineers determined by July 22, 2011 that the heaters complied with all aspects of ITS Construction Review Sheet and Test Data Sheet.[13]

52.     At no time did the GZ laboratory ever issue Reecon any type of notice that the Thermablasters failed to comply with the ANSI standard.

53.     To the contrary, on or shortly after July 15, 2011, the GZ laboratory notified Reecon that the heaters fully complied with the ANSI standard.

54.     At the same time, Brand, in turn, became aware of these representations of full product compliance.

55.     On or shortly after July 15, 2011, the GZ laboratory notified Reecon, through specific instructions and in accordance with the ANSI standard, of certain markings that were required to appear upon the Thermablasters.

56.     Specifically, it was noted that each heater was required to bear, inter alia, a permanent visible mark on that heater stating: 1.  The manufacturer's or distributor's name and address; and 2.  The manufacturer's or distributor's number of the appliance.

57.     Brand relied on this information and proceeded as planned with respect to satisfying Ace's purchase orders.

58.     As a result, a few months later, Brand began to ship heaters from Reecon's facility in China to the United States.

59.     Beyond simply determining whether the heaters complied with the ANSI standard, in the event the heaters failed to comply, it was Intertek NA's custom and practice to work with customers to bring products into compliance.

60.     Thus, had an issue been found with the heaters at the time of testing at the GZ laboratory, Brand could have and would have made sure that the Thermablasters

---

[13] Id.

10

manufactured by Reecon were brought into compliance with the ANSI standard prior to distribution and/or modified the shipment and delivery dates with Ace.

61.     Upon information and belief, on November 14, 2011 following approval and acceptance by Intertek NA, a Test Report was issued at number GZ11070333-1 ("Test Report") certifying that the heaters did, in fact, comply with *all* facets of the applicable ANSI standard.  A true and correct copy is attached hereto as Exhibit "5".

62.     Had the Test Report identified any aspects of the heaters that failed to comply with the ANSI standard, Brand could have and would have made sure that the Thermablasters manufactured by Reecon were brought into compliance with the ANSI standard prior to distribution and/or modified the shipment and delivery dates with Ace.

63.     In or about November of 2011, Brand shipped a number of heaters to Ace.

64.     On or about November 23, November 27, and December 3, 2011, Brand received payment from Ace for the heaters totaling an amount of $443,830.15

65.     It was at this point that ProCom, a direct competitor of Brand and the only other company from whom Ace purchased vent free heaters, began a campaign specifically designed to disrupt Brand's blossoming business relationship with Ace.

66.     On December 12, 2011, ProCom filed suit against Brand, alleging that Brand's heaters infringed on a patent held by ProCom relative to the heater's dual fuel oxygen depletion sensor system.

67.     On December 14, 2011, ProCom sent Ace a letter advising of the alleged patent infringement.

68.     In response, Ace temporarily restricted the sale and distribution of Brand's heaters.

69.     On January 18, 2012, Campo contacted Brand and expressed concern over whether Brand's heaters truly complied with all aspects of the ANSI standard.

70.     In response Brand, relying on Intertek NA's representations of product compliance, provided Campo a copy of the Test Report showing full compliance with the ANSI standard.

71.     Satisfied with the Test Report, and despite ProCom's patent infringement lawsuit, Ace lifted its restriction on the heaters and permitted Brand to attend an upcoming product display show.

72.     In fact, on January 27, 2012, Brian Larson, assistant buyer for Ace, sent a confirmation email indicating that Thermablaster heaters were, once again, available for sale through Ace, all restrictions on the products having been lifted.

73.     On January 30, 2012, despite ProCom's claims of patent infringement and noncompliance with ANSI standards, Ace sent Brand an invoice for the 2012 spring show in Atlanta, which confirmed the acceptance of Brand's heaters.  At this point, all issues between Brand and Ace had been resolved.

74.     Upon information and belief, during this same period, ProCom contacted Intertek directly and requested that Intertek NA revoke its certification and ATM of Brand's heaters.

75.     Upon information and belief, sometime after January 30, 2012, ProCom again contacted Ace and advised them that despite the Test Report and certification, Brand's heaters failed to comply with portions of the ANSI standard.

76.      On February 9, 2012, Campo sent an email to Charlie Aranoff ("Aranoff"), Brand's liaison to Ace, informing him that Ace was pulling Brand's heaters from sale and

would not reinstate them until the issue as to whether Brand's heaters fully complied with the ANSI standard was resolved.

77.     On February 14, 2012, Brand sent Ace an email outlining the documents and facts that proved that the heaters fully complied with the ANSI standards.

78.     On February 22, 2012, Campo requested Aranoff set up a phone call with Brand. Brand called Campo the same day and confirmed that Brand was ready to attend the upcoming show, after which Campo informed Brand that he would follow up by the end of that day.  Campo never called back.  February 22, 2012, was the last day Campo had contact with Brand.

79.     On February 29, 2012, Intertek NA sent Reecon an updated ATM, which authorized the application of Intertek's certification mark on the Thermablasters.  The ATM listed Thermablaster as a brand name for the heaters.  A true and correct copy is attached hereto as Exhibit "6".

80.     Intertek NA noted that the updated ATM superseded all previous ATMs and, again, was based on Test Report GZ11070333-1.  Moreover, the ATM certified that the Thermablasters complied with the ANSI standard.

81.     By letter dated March 8, 2012, just eight days after Intertek NA's issuance of the updated ATM, Pamela Brown of Intertek NA informed Reecon that all listing and labeling privileges for Brand's heaters were suspended pending an investigation.  Intertek NA also advised Reecon to quarantine all inventories of products covered by the November 14, 2011 test report.  Reecon was advised to contact Intertek NA engineer Rick Curkeet ("Curkeet") regarding details of the investigation.

82.    On March 12, 2012, while Intertek NA's investigation into the complaint of non-compliance was ongoing[14], Curkeet sent an email to Campo, and advised that, "the Thermalblaster (sic) units have been found to be in non-compliance with the specified standard.  We are expecting the manufacturer to take appropriate actions in this matter.  Obviously you should quarantine those you have and keep them out of the market."

83.    On March 13, 2012, Curkeet emailed Fu and Brand and advised that the "main issue" he had with Brand's heaters was that they lacked a built in pressure regulator.  To support his position, Curkeet cited two subsections of ANSI Z21.11.2.

84.    On March 16, 2012, Paul Cranley, counsel for Ace acknowledged by way of formal letter that Ace had, in fact, received the aforesaid email from Curkeet.

85.    During this same period, Brand repeatedly attempted to supply Curkeet with assembled samples of the heaters for use in Intertek's non-compliance investigation.  Curkeet, however, never responded to Brand's offers to provide assembled heaters.

86.    On March 16, 2012, Curkeet sent an internal email to numerous Intertek personnel stating, in part, "This was obviously GZ's [GZ laboratory] first project related to ANSI Z21.11.2.  Clearly training and experience are lacking."  A true and correct copy is attached hereto as Exhibit "7".

87.    As a result of the GZ laboratory's lack of training and experience, Curkeet instituted a requirement that all future projects related to the ANSI standard be submitted to Curkeet for direct review and verification.

88.    Also on March 16, 2012, Graham Moxon ("Moxon"), the engineer appointed by Intertek NA to oversee and review the work of the GZ engineers sent an internal email

---

[14] A March 13, 2012 email from Intertek Field Report Manger, Michelle Lake, confirmed that the investigation was currently ongoing.

to numerous Intertek personnel stating, in part, that the GZ engineers incorrectly deemed the Thermablasters compliant to the ANSI standard due to a "lack of knowledge of the product, training and interpretation of the specification."   A true and correct copy is attached hereto as Exhibit "8".

89.    By letter dated March 23, 2012, Curkeet on behalf of Intertek NA, advised Reecon that Brand's heaters had been found non-compliant in regards to the gas pressure regulator, appliance labeling, manual language and natural gas versus propane performance.

90.     In response to Intertek's finding, on March 24 and March 25, 2012, Fu met with Charles Cheng ("Cheng"), project engineer for Intertek Shenzhen who prepared the November 14, 2011 Test Report, Ham Zhang ("Zhang"), team leader for Intertek Shenzhen  who checked and signed off on the Test Report and their supervisor, Moxon to discuss the non-compliance issues raised by Curkeet and a solution thereto.

91.    Following the meeting on March 25, 2012, Fu sent a follow up email to Cheng, Zheng and Moxon summarizing what both sides had agreed to.

92.    Specifically, Fu summarized the meeting as follows:

  a.  The certification test procedures and test results held by Intertek Guangzhou complied with the ANSI standard completely.

  b.  Reecon agreed that by the time the heaters were sold to consumers the pressure regulator should already be assembled.

  c.  Reecon would advise Brand to prepare a sample heater with the pressure regulator assembled to send to Curkeet for final approval.

d.   Brand would agree to assemble pressure regulators on all heaters already
in the United States.

e.   Labeling issues would be addressed.

93.     The next day, March 26, 2012, Zhang emailed Fu with Cheng carbon copied
and stated, "You (sic) email reflects just what we ever discussed, I think it's OK.
Thanks for your kind assistance.)"  Thus, Zhang confirmed that the heaters were in full
compliance with the ANSI standard.

94.     By letter dated April 4, 2012, Q VanBenschoten, regional compliance officer
for Intertek, advised legal counsel for Ace that Intertek's investigation was complete and
Brand's heaters had been determined noncompliant with the ANSI standard.  Ace was
also advised that the Consumer Product Safety Commission was to be notified and that
Intertek had suspended its ETL certification mark for the Thermablasters.

95.     In this same letter, Intertek advised Ace that it had indicated to Brand that, "if a
suitable retro-fit program could be developed, we [Intertek NA] would consider an
inspection program to allow sale of the units currently in your [Ace] warehouses."

96.     In response, Brand attempted to comply with the remedial measures agreed
upon during Fu's meeting in China in numerous ways including but not limited to
retrofitting all heaters in the United States with pressure regulators.

97.     To date, despite Brand's various attempts to bring the heaters into compliance,
Intertek NA refused to accept any of Brand's proposed plans to bring the Thermablasters
into compliance with the ANSI standard.

98.    As a result, on May 11, 2012, Ace formally notified Brand that Brand was in breach of its warranties to Ace because none of the heaters Brand sold to Ace complied with ANSI standards.

99.    Ace further notified Brand that it was revoking its acceptance of the heaters, demanded that Brand accept immediate return of the unsold heaters, and demanded a refund of the entire purchase price, $453,221.74, paid by Ace.

100.    Ace never demanded a refund until after it was notified by Intertek NA that the heaters failed to comply with the ANSI standard.

101.    Thereafter, on or about July 9, 2012, Brand was served with a complaint from Ace, seeking damages in the amount of $453,221.74 for the cost of the heaters that Ace cannot sell, plus shipping, handling, storage costs and attorney's fees related thereto.

102.    By letter dated August 3, 2012, William Starr advised Fu and Brand that, "Intertek regrets to inform you that your ETL Listing and Labeling privileges for Listing Report GZ11070333-1 are terminated effective immediately."  A true and correct copy is attached hereto as Exhibit "9".

103.    In reliance on the representations of Intertek NA that the Thermablasters complied with the ANSI standard, Brand sold or distributed Thermablasters bearing the ETL Mark.

104.    On or about September 10, 2012, despite Intertek NA's representations to Reecon and certain third parties, including Brand, of the Thermablasters' compliance with the ANSI standard, Intertek NA published a Product Safety Alert.  A true and correct copy is attached hereto as Exhibit "10".

105.   The Product Safety Alert advised consumers and retailers, like Ace, that the Thermablasters, sold by Brand, were not authorized to bear the ETL Mark.

106.   The Product Safety Alert also advised consumers and retailers, like Ace, that the Thermablasters following an investigation by Intertek NA had been deemed noncompliant with the applicable standard and posed a safety hazard.

107.   At the time of the events in question, Intertek NA was in the business, inter alia, of providing services and/or information for the guidance of others that Intertek knew third parties like Brand would rely upon in their business endeavors.

108.   Intertek NA profited from the testing and certification services here at issue.

109.   The NRTL Program, is a part of OSHA's Directorate of Technical Support and Emergency Management. The Program recognizes private sector organizations as NRTLs, and recognition signifies that an organization has met the necessary qualifications specified in the regulations for the Program. The NRTL determines that specific equipment and materials (products) meet consensus-based standards of safety to provide the assurance, required by OSHA, that these products are safe for use in the U.S. workplace.

110.   The GZ laboratory is not and has never been recognized by OSHA as an NRTL.

111.   At the time of the events in question, Intertek NA knew that the GZ laboratory was neither a NRTL nor accredited for the ANSI standard by IAS.

112.   At the time Reecon renewed its Certification Agreement for testing of the Thermablasters, Intertek NA represented that its engineers had sufficient training and experience to properly and accurately perform the testing.  This representation was false.

113.   At the time Reecon renewed its Certification Agreement for testing of the Thermablasters, Intertek NA knew that the GZ laboratory had never before tested a product to the ANSI standard and that the GZ engineers were not sufficiently trained or experienced to properly and accurately perform the testing.  This representation that it had experience testing to the ANSI standard was false.

114.   At the time Reecon renewed its Certification Agreement for testing of the Thermablasters, Intertek NA knew that third parties, specifically buyers of the Thermablaster, including Brand, would rely on Intertek NA's representation that its engineers had sufficient training and experience to properly and accurately perform the testing.

115.   Intertek NA owed a duty to third parties, specifically buyers of the Thermablaster, including Brand, that relied on Intertek NA for guidance to exercise reasonable care or competence in performing its testing and certification services and obtaining or communicating the aforesaid information.

116.   The GZ engineers, whose work Intertek NA was responsible for, represented to Reecon that the Thermablasters fully complied with all facets of the ANSI standard.  This representation was false.

117.   At the time that the GZ engineers represented to Reecon that the Thermablasters fully complied with all facets of the ANSI standard, Intertek NA knew that third parties, specifically buyers of the Thermablaster, including Brand, would rely on this information in the course of its business.

118.   Any and all losses and harms sustained by Brand as stated herein were the direct and proximate result of Brand's reliance on the information supplied by Intertek NA related to its testing and certification services of the Thermablaster.

119.   Any and all losses and harms sustained by Brand as stated herein were the direct and proximate result of Intertek NA's failure to exercise reasonable care or competence in obtaining or communicating the information stated herein.

120.   Any and all losses and harms sustained by Brand as stated herein were the direct and proximate result of intentional actions and/or omissions of Intertek NA and/or ProCom as stated herein.

121.   As a result of intentional actions and/or omissions of Intertek NA and/or ProCom, Brand will incur the damages set forth in Ace's complaint.

122.   As a result of actions and/or omissions of Intertek NA and/or ProCom, Brand's business relations with Ace have been irreparably harmed, causing it past, present and future pecuniary harm.  Specifically, Brand has had a judgment entered against it by Ace in the amount of $611,060.45, Brand has lost future profits with Ace expected to be more than $1 million, Brand has also incurred losses related to ancillary contracts that have been harmed as well as additional costs, attorneys fees and interest.

123.   As a result of actions and/or omissions of Intertek NA and/or ProCom, Brand's business relations with other wholesale purchasers have been irreparably harmed, causing him past, present and future pecuniary harm as stated above.

124.   As a result of actions and/or omissions of Intertek NA and/or ProCom, Brand's personal and business reputation has been irreparably harmed.

125.   The actions of Intertek NA and ProCom, acting individually and/or by and through its agents, servants or employees were malicious, wanton, willful, oppressive and exhibited a reckless indifference to the rights of Brand justifying the imposition of punitive damages.

**COUNT I**
**Misrepresentation**
Brand Marketing Group, LLC, d/b/a Thermablaster v. Intertek Testing Services NA, Inc.,
d/b/a Intertek Testing Services

126.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

127.   In the course of its business of providing product testing and certification services for the Thermablaster, Intertek NA supplied false information for the guidance of others, including Brand, in their business transactions in some or all of the following ways:

    a.   In representing that the GZ laboratory was an NRTL;

    b.   In representing that Intertek NA and/or the GZ laboratory, for which it was responsible, was sufficiently qualified and experienced to test products to the ANSI standard;

    c.   In representing that Intertek NA and/or the GZ laboratory had any experience testing products to the ANSI standard;

    d.   In representing that Intertek NA and/or the GZ laboratory had the proper guidelines by which to test to the ANSI standard;

    e.   In representing that Intertek NA and/or the GZ laboratory had the proper equipment by which to test to the ANSI standard;

    f.   In representing that testing performed would and did have sufficient oversight;

    g.   In representing that the Thermablasters fully complied with the ANSI standard;

    h.   In omitting to publish the various ways in which the Thermablasters did not comply with the ANSI standard.

128.   Intertek NA failed to exercise reasonable care or competence in obtaining or communicating this information.

129.   Intertek NA knew that the aforesaid communications and representations were false.

130.   In obtaining and communicating this false information, Intertek NA knew that this information was for the benefit and guidance of third parties, including buyers of the Thermablasters, specifically, Brand.

131.   In obtaining and communicating this false information, Intertek NA knew that Reecon intended to supply the information to third parties, including buyers of the Thermablasters, specifically, Brand.

132.   Intertek NA knew that the information it supplied to Reecon would be relied upon by Brand.

133.   Brand justifiably relied upon the false information supplied by Intertek NA and suffered pecuniary loss as stated herein as a result.

134.   Resultantly, Intertek NA is subject to liability for the damages to Brand stated herein.

## COUNT II
### Interference with Contractual Relations
Brand Marketing Group, LLC, d/b/a Thermablaster v. Intertek Testing Services NA, Inc., d/b/a Intertek Testing Services

135.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

136.   Brand had a valid contract for the sale of heaters with Ace.  In fact, Brand had delivered heaters to Ace and received financial consideration in return.

137.   Despite its own engineers having fully certified the heaters compliant with the ANSI standard, Intertek NA purposely with intent to harm Brand's existing relationship with Ace, advised Ace that the heaters failed to comply with the ANSI standard and, therefore, could not be sold.

138.   Intertek NA acted without privilege or justification.

139.   As a result of Intertek NA's intentional interference with Brand's contractual relationship with Ace, Brand suffered damages as stated herein.


## COUNT III
### Disparagement
Brand Marketing Group, LLC, d/b/a Thermablaster v. Intertek Testing Services NA, Inc., d/b/a Intertek Testing Services

140.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

141.   Intertek NA published to Ace and others a false statement about Brand, specifically, that the Thermablasters Brand sold failed to comply with the ANSI standard and/or were dangerous.

142.   Intertek NA knew that the statement was false because the GZ engineers and individuals from Intertek NA inspected the heaters and found them fully compliant with the ANSI standard prompting the Test Report and Authorization to Mark.

143.   Additionally, the Consumer Product Safety Commission ("CPSC") is an independent agency of the Untied States government that regulates the sale and manufacture of more than 15,000 different consumer products including vent free wall heaters.  The CPSC fulfills its mission by banning dangerous consumer products, issuing recalls of products already on the market, and researching potential hazards associated with consumer products.

144.   Ultimately the CPSC is the only entity that may make a public pronouncement regarding the safety of a consumer product.

145.   On September 10, 2012, prior to the CPSC completing a full investigation, Intertek NA issued a Product Safety Alert warning consumers and retailers, inter alia, that Brand's Thermablaster posed a safety hazard.

146.   Subsequent to Intertek NA's public notice, the CPSC issued a final report in which it concluded that the Thermablasters did not pose a safety hazard.

147.   Intertek NA reasonably should have recognized that publication of the false statement would result in Brand sustaining a pecuniary loss.

148.   As a result of Intertek NA's publication of a false statement, Brand sustained pecuniary loss.

149.   Accordingly, Intertek is subject to liability for the damages to Brand stated herein.

## COUNT IV
## Corporate Defamation
### Brand Marketing Group, LLC, d/b/a Thermablaster v. Intertek Testing Services NA, Inc., d/b/a Intertek Testing Services

150.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

151.   Intertek NA published to Ace and others a false and defamatory statement about Brand, specifically, that Brand's heaters failed to comply with the ANSI standard.

152.   Intertek NA knew that the statement was false because Intertek Shenzhen's engineers and individuals from Intertek NA inspected the heaters and found them fully compliant with the ANSI standard prompting the Test Report and Authorization to Mark.

153.   Additionally, the Consumer Product Safety Commission ("CPSC") is an independent agency of the Untied States government that regulates the sale and manufacture of more than 15,000 different consumer products including vent free wall heaters.  The CPSC fulfills its mission by banning dangerous consumer products, issuing recalls of products already on the market, and researching potential hazards associated with consumer products.

154.   Ultimately the CPSC is the only entity that may make a public pronouncement regarding the safety of a consumer product.

155.   On September 10, 2012, prior to the CPSC completing a full investigation, Intertek NA issued a Product Safety Alert warning consumers and retailers, inter alia, that Brand's Thermablaster posed a safety hazard.

156.   Subsequent to Intertek NA's public notice, the CPSC issued a final report in which it concluded that the Thermablasters did not pose a safety hazard.

157.   Ace, as recipient of the defamatory statement, recognized that the statement applied to Brand and discredited the quality and merchantability of Brand's heaters

158.   Intertek NA reasonably should have recognized that publication of the false statement would result in Brand sustaining a pecuniary loss.

159.   As a result of Intertek NA's publication of a false statement, Brand sustained pecuniary loss and damage to its professional reputation.

160.   Accordingly, Intertek is subject to liability for the damages to Brand stated herein.

## COUNT V
### Disparagement
Brand Marketing Group, LLC, d/b/a Thermablaster v. Continental Appliances, Inc., d/b/a ProCom

161.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

162.   ProCom published to Ace and others a false statement about Brand, specifically, that Brand's heaters failed to comply with the ANSI standard.

163.   ProCom knew that the statement was false because Intertek NA's own engineers inspected the heaters and found them fully compliant with the ANSI standard prompting the Listing Report and Authorization to Mark.

164.   ProCom reasonably should have recognized that publication of the false statement would result in Brand sustaining a pecuniary loss.

165.   As a result of ProCom's publication of a false statement, Brand sustained pecuniary loss.

166.   Accordingly, ProCom is subject to liability for the damages to Brand stated herein.

## COUNT VI
## Corporate Defamation
Brand Marketing Group, LLC, d/b/a Thermablaster v. Continental Appliances, Inc., d/b/a ProCom

167.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

168.   ProCom published to Ace and others a false and defamatory statement about Brand, specifically, that Brand's heaters failed to comply with the ANSI standard.

169.   ProCom knew that the statement was false because Intertek NA's own engineers inspected the heaters and found them fully compliant with the ANSI standard prompting the Listing Report and Authorization to Mark.

170.   Ace, as recipient of the defamatory statement, recognized that the statement applied to Brand and discredited the quality and merchantability of Brand's heaters

171.   ProCom reasonably should have recognized that publication of the false statement would result in Brand sustaining a pecuniary loss.

172.   As a result of ProCom's publication of a false statement, Brand sustained pecuniary loss and damage to its professional reputation.

173.   Accordingly, ProCom is subject to liability for the damages to Brand stated herein.

## COUNT VII
## Interference with Contractual Relations
Brand Marketing Group, LLC, d/b/a Thermablaster v. Continental Appliances, Inc., d/b/a ProCom

174.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

175.   Brand had a valid contract for the sale of heaters with Ace as evinced by purchase orders attached as Exhibit "2".  In fact, Brand had delivered heaters to Ace and received financial consideration in return.

176.   Despite Intertek NA's engineers having fully certified the heaters compliant with the ANSI standard, ProCom purposely with an intent to harm Brand's existing relationship with Ace, advised Ace that the heaters failed to comply with the ANSI standard and, therefore, could not be sold.

177.   ProCom acted without privilege or justification.

178.   As a result of ProCom's intentional interference with Brand's contractual relationship with Ace, Brand suffered damages as stated herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays:

1.   **All Permissible Damages. Compensatory Damages**.  That the Court award Plaintiff compensatory damages in an amount to be proven at trial;

2.   **Punitive and Exemplary Damages.** That this Court award punitive and exemplary damages against Defendants and in favor of Plaintiff in a sum to be determined at trial.

3.   **Additional Damages.** Furthermore, that this Court grant such other and further relief as it shall deem to be just and proper.

Dated: February 5, 2013

BY:/s/ Brendan B. Lupetin_____
Brendan B. Lupetin, Esquire (PA I.D. # 201164)
blupetin@pghtriallawyers.com

Portnoy & Quinn, LLC
Three Gateway Center, Suite 2325
401 Liberty Avenue
Pittsburgh, PA 15222-5402
(412) 765-3800  Telephone
(412) 765-3747  Facsimile


Attorneys for Plaintiff Brand Marketing
Group, LLC, d/b/a Thermablaster

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within Response to Defendant's

Motion to Compel Arbitration has been filed electronically on this 5th day of February,

2013.  Notice of this filing will be sent to all parties listed below by operation of the

Court's filing system.  Parties may access this filing through the Court's system.

Nancy R. Winschel, Esquire
Stephen M. Hougton, Esquire
Michael J. Joyce, Esquire
Dickie McCamey & Chilcote
Two PPG Place, Suite 400
Pittsburgh, PA  15222

/s/ Brendan B. Lupetin_____
Brendan B. Lupetin, Esquire (PA I.D. # 201164)
blupetin@pghtriallawyers.com

Portnoy & Quinn, LLC
Three Gateway Center, Suite 2325
401 Liberty Avenue
Pittsburgh, PA 15222-5402
(412) 765-3800  Telephone
(412) 765-3747  Facsimile

Attorneys for Plaintiff Brand Marketing
Group, LLC, d/b/a Thermablaster