IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRAND MARKETING GROUP, LLC *doing business as* THERMABLASTER,

        Plaintiff,

           v.

INTERTEK TESTING SERVICES NA, INC.
*doing business as* INTERTEK TESTING
SERVICES,

        Defendant.

12cv1572
**ELECTRONICALLY FILED**

## **Memorandum Opinion on Defendant's Post Trial Motion[1]**

### I.    **Introduction**

This is an action for Negligent Misrepresentation against Defendant, and for Trademark Infringement and other Counterclaims against Plaintiff. Although the factual and procedural history is storied and fraught with contention, the core of this lawsuit is a relatively straightforward commercial dispute. At the conclusion of trial, the jury unanimously found that Defendant made Negligent (and reckless) Misrepresentations. The verdict reflects that: Defendant materially misrepresented its ability and expertise in the safety testing and certification process with the product at issue, especially at its China facility; and second, Defendant materially misrepresented to Plaintiff that its product complied with United States safety standards, when it did not. The jury heard evidence that Defendant's testing, certification, and quality control business process was plagued with errors and inadequacies at numerous levels, all of which culminated in Plaintiff's detrimental and justifiable reliance on these material misrepresentations, and caused financial harm to Plaintiff's business.

---

[1] Although styled as one "Motion," Doc. No. 287 has many subparts.

David O. Brand, a small business owner from Pittsburgh and the principal of Brand Marketing Group LLC ("Plaintiff" or "Brand"), an inventor of portable vent-free space heaters, contracted with Reecon M & E Co. Ltd, ("Reecon"), a corporate entity (located in China) to manufacture his (mockup) space heaters to applicable North American safety standards ("ANSI standards"). Based upon the favorable results of the testing performed by Intertek Testing Services, NA. Inc. ("Defendant" or "Intertek"), a leading global safety testing company, and one in which non-party Reecon had contracted to perform testing services, Plaintiff then contracted with Reecon to produce, en-masse, the space heaters for shipment and ultimate sale to Ace Hardware, who had a purchase order for close to 4,000 of the space heaters.

As mentioned, Defendant, who bills itself as a foremost "expert" in the field of safety testing and certification, has offices and testing facilities in North America, and in China, among others. The safety testing in this case was performed in Defendant's China lab, located in Guanzhou ("GZ"), because the China affiliate had alleged expertise in this field of safety testing and certification.

Following a three-day jury trial, the jury entered nearly two days of deliberation, in which it necessarily resolved numerous credibility determinations in favor of Plaintiff's and against Defendant's version of the facts (recounted below). The jury ultimately entered a unanimous verdict in favor of Plaintiff on its negligent misrepresentation claim and against Defendant, and awarded $725,000.00 in past damages, $320,000.00 in future damages, and $5 million in punitive damages. With respect to Defendant's three Counterclaims against Plaintiff, the jury found that Plaintiff infringed upon the intellectual property trademark rights of Intertek (ETL Listing) under the Lanham Act, but found it was not willful, and did not award compensatory damages or punitive damages against Plaintiff. The jury found in favor of Plaintiff on the two

remaining Counterclaims. This verdict is supported by the testimony and evidence presented during trial.

In reaching its verdict, the jury must have determined that the evidence presented at trial established grave errors and inadequacies in Intertek's testing and certification process that allowed space heaters that did not comply with applicable safety standards in the United States (ANSI Standards) to be put into the stream of commerce.  There was no dispute that the heaters were non-compliant with ANSI standards; rather, the dispute appeared to center upon whether these alleged "errors" and "mistakes" were negligent misrepresentations and/or were reckless, and/or whether the errors that Defendant made were the cause of the harm to Plaintiff, or whether Plaintiff's improper use of the certification mark (ETL listing) was the cause of the harm.

Defendant now seeks to attack nearly every portion of the trial, and urges this Court to usurp the legitimate conclusions of the fact-finders, who had ample competent evidence upon which to base its verdict.

Pursuant to Fed. R. Civ. P. 50 and 59, Defendant asks this Court to: (A) vacate the punitive damages and/or to grant a new trial, because the issue of punitive damages was not properly before the jury; (B) remit the punitive damages based upon an alleged constitutional violation; (C) vacate the compensatory damages; (D) grant a new trial because the liability verdict was "inconsistent;" and (E) grant a set-off against the compensatory sum awarded Plaintiff for the judgment that Intertek purchased.  Defendant also moves this Court (see Section V(F)) for a new trial on the basis that this Court "unduly harmed Intertek" by allowing evidence of the amount Intertek paid for a judgment set-off while not allowing evidence of Plaintiff's violation of its competitor's patent.

A careful review of the arguments made by Defendant reveals that the issues it raises are not supported by, or are contrary to, the evidence of record, and potentially have been abandoned by Defendant during the pretrial or trial proceedings. The legal and factual underpinnings of the pretrial and trial process are sound and abundantly supported by the evidence, and for this Court to reduce or eliminate Plaintiff's claim and damages, would do nothing except to usurp the critical functions of the jury.

Furthermore, punitive damages were properly before the jury and the award by the jury is not grossly excessive; rather, it represents only a small fraction of the net worth of the Defendant, just one factor which shows that it is reasonable in light of the record. Moreover, the record evidence that was elicited throughout the proceedings, culminating with the testimony of Defendant's General Counsel, demonstrated that Defendant knew of the numerous grave "errors" and inadequacies in the testing and business process, but failed to take responsibility or adequately correct those problems. The evidence allowed the fact finder to reasonably conclude that the goal of the business dealings between the parties (from Defendant's perspective) was to make to make it "painful" and "personally difficult" for Plaintiff.[2] There was ample evidence of

---

[2] General Counsel for Defendant, Richard John, provided trial testimony, upon which the jury could have reasonably believed, after judging his credibility and demeanor, that he made such statements to Plaintiff's principal, David O. Brand. Oddly, Defendant opened the door to discuss the mediation process, even after the Court counseled him not to present General Counsel, Mr. John, as a witness at the conclusion of Defendant's case. On direct examination, Defense Counsel questioned Mr. John about the mediation process, which the Court interrupted (even hearing no objection thereto) and advised Defense Counsel that there are rules against discussing a confidential mediation in open court. In fact, this Court stated it had never heard the term "mediation" referred to in open court. Doc. No. 284 at 75-76. Plaintiff's counsel responded that he was "fine" with the line of questioning and had no objection. Upon cross-examination by Plaintiff's counsel, at the very conclusion of the case, General Counsel John testified as follows:

> Q. Since it was mentioned just now, I want to see if you remember something that I don't think I'll ever forget.
> THE COURT: Do you want to move the microphone where we can all hear you? Thank you.
> Q. Do you remember when you were in a room with me and David? Do you remember that at one point?

recklessness to submit the question to a jury for it to determine whether punitive damages were warranted.  Intertek's dissatisfaction with the verdict does not make it an "irrational" one, or one that should be disturbed.

For the myriad reasons that follow, the Court will deny Defendant's Motion for Post-Trial Relief pursuant to Fed. R. Civ. P. 50 and 59, on all arguments with the exception of Defendant's request for an equitable set-off, to which Plaintiff does not object, and this Court agrees is warranted.

## II.    Factual and Procedural History

By way of background, the facts as set forth in the pleadings, and as presented during trial, are as follows.

### A.    The Parties

Brand Marketing is a limited liability company which imports and sells vent free gas room heaters throughout the United States.  Defendant, Intertek NA, is a subsidiary of Intertek Group PLC ("Intertek Group"), a multinational inspection, product testing and certification company headquartered in London.  Intertek Testing Services Shenzhen, Ltd. ("Intertek Shenzhen") is a separate corporate subsidiary of Intertek Group located in Guangzhou, China.

---

A. If you give me more detail, I might.
Q. Well, I remember this. This is what I remember. You tell me if you remember it. You look at Mr. Brand sitting right next to me, and you tell him about this case. I want you to know --
A. Are you talking about a mediation?
Q. I'm talking about a meeting. We're talking about if you remember this meeting.
A. I'm trying to remember the meeting. Are you talking about whether we were --
Q. I'm talking --
THE COURT: Why don't we let him answer the question?
Q. I'm asking you if you remember this. Do you remember saying to David Brand we're going to make this painful? We're going to make this personally difficult for you? Do you remember saying that to him?
A. I don't, although I would say that litigation is almost always personally difficult and painful. But I don't know when that was. When are you talking about?
Q. You know what. I guess you don't remember. Thanks.

*Id.* Intertek NA is a nationally recognized testing laboratory accredited to certify products compliant with North American Safety Standards. However, Intertek Shenzhen, the location where the relevant testing in this matter took place, is not accredited to certify compliance with North American Safety Standards.

Prior to Brand's involvement in the circumstances at issue here, Reecon, a Chinese manufacturing company, had contracted with Intertek NA for testing of other unrelated products. Doc. No. 19 at Exhibit 4, and Doc. No. 31, Exhibit C.

### B. Brief Factual History Surrounding Testing and Certification Process[3]

Following Ace's indication of an intent to purchase the heaters in December 2010, Brand contacted Reecon regarding the manufacture of the heater. Once Brand received the purchase order from Ace on April 26, 2011, Brand worked with Reecon to have the heaters certified "compliant" with applicable ANSI standards, which govern unvented room heaters for sale in the United States.

Intertek NA provided testing and certification services for the heaters, in exchange for money paid by Reecon, in accordance with the Certification Agreement. The heaters were tested to the ANSI standards at Intertek Shenzhen, based upon oral and written representations by Defendant's salespersons that the Intertek China lab was best qualified to handle the testing and certification process. The trial testimony established that the testing process occurred from July 6, 2011, through July 22, 2011, and David Brand was in China during this time period. Based upon the favorable results of that testing, as listed in the Intertek Testing Data Sheet (dated July 22, 2011) (P-58), and after a meeting with the personal meeting with the engineers in China,

---

[3] To avoid repetition, the Court has provided only certain basic facts surrounding the alleged Negligent Misrepresentations made during the testing and certification process, in this section. Many further facts are contained within the Discussion section of this Opinion (V).

Brand moved forward with mass production on July 26, 2011, when Brand signed a purchase order in the amount of $451,482, with Reecon for approximately 5,500 heaters, the majority of which went to Ace Hardware for October, 2011 shipment.

However, on November 14, 2011 (almost four months later), Intertek issued a Test Report certifying compliance with an ANSI standard. The trial testimony established that even though Intertek Shenzhen was not an accredited nationally recognized testing laboratory, on February 29, 2012, Intertek NA issued an "updated" Authorization to Mark ("ATM") indicating that a product complies with the standard it was tested to (in this case ANSI Z21.11). According to Plaintiff, the test report and ATM were representations made by Intertek NA that the heaters complied with the applicable ANSI standard. They did not. According to the trial testimony of Defendant's witnesses (Defendant's liability expert Steven Roll, and Defendant's Chief Engineer, Rick Curkeet), many mistakes (which are further addressed below) were made during the testing and certification process.

### C.  Ace Temporarily Restricts Sale of Thermablaster

On December 12, 2011, former defendant Continental Appliances, Inc., doing business as ProCom ("ProCom"), a direct competitor of Brand, and the only other company from whom Ace purchased vent free heaters, sued Brand for patent infringement. On December 14, 2011, ProCom sent Ace a letter advising of the alleged patent infringement. Ace temporarily restricted the sale and distribution of Brand's heaters. Following a brief investigation of the allegations surrounding infringement, the Thermablaster was put back on the market. On November 5, 2012, ProCom and Plaintiff settled their dispute. Doc. No. 61.

### D.     Defendant Contacts Ace Hardware

On March 8, 2012, Intertek suspended its listing and labeling privileges for Brand's heaters, and advised Reecon to quarantine all inventories of products covered by the November 14, 2011, test report. On March 12, 2012, Rick Curkeet, sent an email to Ace advising that "the Thermalblaster (sic) units have been found to be in non-compliance with the specified standard. We are expecting the manufacturer to take appropriate actions in this matter. Obviously you should quarantine those you have and keep them out of the market."

### E.     Ace Obtains Default Judgment against Plaintiff

On May 11, 2012, Ace formally notified Brand that it had breached its warranties to Ace, and demanded that Brand accept immediate return of the unsold heaters, and on July 9, 2012, filed a lawsuit against Brand seeking damages in the amount of $453,221.74 for the unsold heaters, plus costs. Ace obtained a default judgment against Brand in the amount of $611,060.45 (following an email exchange with Plaintiff in which he stated words to the effect that he did not care that this was the case). This judgment was assigned to Intertek and is the subject of much debate within these proceedings.

### F.     Plaintiff Commences Litigation against Defendant

### (1)     Original Pleadings

Brand filed suit in the Court of Common Pleas of Allegheny County, Pennsylvania, on September 20, 2012, and this matter was properly removed to this Court on October 30, 2012. Doc. No. 1. After two rounds of Motions to Dismiss and a Motion to Compel Arbitration, all of which were ultimately denied by this Court, on February 5, 2013, Plaintiff filed a Second Amended Complaint alleging the following tort theories: (1) Misrepresentation (Section 552 of the Restatement of Torts (Second)); (2) Interference with Contractual Relations; (3)

Disparagement; (4) Corporate Defamation against Defendant Intertek, NA; and Counts (5) (6) and (7), for Disparagement, Corporate Defamation and Interference with Contractual Relations (respectively) against ProCom. Doc. No. 42. Plaintiff and ProCom, then filed a stipulation to strike certain allegations from the Second Amended Complaint, which this Court granted on March 21, 2013, thereby eliminating ProCom as a Defendant in this case. Doc. No. 47; See also Doc. No. 65.

Defendant Intertek then filed its Answer and Counterclaim, wherein it alleged Counterclaims of: (1) Defamation; (2) Commercial Disparagement; (3) Fraud; and (4) Unfair Competition/Trademark Infringement for Plaintiff's premature use of the Mark. Doc. No. 44.

### (2) Cross-Motions for Summary Judgment

Plaintiff moved for summary judgment on the basis that, as a matter of law, Intertek is vicariously liable for the actions of its servant, Intertek Testing Services Shenzhen, Ltd and Intertek, negligently, and fraudulently, supplied information for the guidance of others that contains misrepresentations (false advertising and false safety test results) under Restatement of Torts 2d § 552. Plaintiff further moved for summary judgment on Intertek's Counterclaims for Trademark Infringement and Fraudulent Concealment, primarily on the basis that Intertek has unclean hands, and cannot establish damages as a matter of law. Doc. No. 76.

Defendant Intertek also moved for summary judgment, contending that Plaintiff cannot establish that a causal link between the alleged conduct of Intertek and Plaintiff's claimed damages. Additionally, Intertek argued that Plaintiff could not establish the required elements for its Defamation, Disparagement and Tortious Interference with Contract Claims. Doc. No. 72. Finally, Intertek moved for summary judgment as to its Fourth Counterclaim for Trademark Infringement/Unfair Competition. Doc. No. 74.

On June 10, 2013, the Court denied summary judgment to both parties on all counts of the Second Amended Complaint, or Defendant's Counterclaims, finding that they were factual disputes that must be determined by a jury. Doc. No. 89.

### (3) Pretrial and Trial Proceedings

The trial was originally scheduled to commence on September 3, 2014. Because the parties were unable to reach agreement on many of the jury instructions and verdict slips during the pretrial proceedings, the Court undertook to draft and redraft several versions of the Final Jury Instructions, as the parties continued to dismiss Claims and Counterclaims all the way up until August 27, 2014 (less than a week before the originally scheduled trial). Doc. No. 175.

Despite the best efforts of this Court to conduct the pretrial proceedings in an organized fashion, the Court had difficulty focusing the parties on the pretrial process (the parties filed at least five revised versions of the verdict slip and jury instructions, and the Court had several meetings with the attorneys), and as a result, the Court was required to make numerous substantive changes to the jury instructions and verdict slips in the weeks, days, and hours leading up to the originally scheduled trial.[4]

The Court also attempted to bring the parties together to mediate this case on numerous occasions, and the last scheduled mediation was before a mediator selected by the Court, Michael Betts.[5] The Court ordered non-party Ace to attend, because it was obvious that the default judgment that it held against Plaintiff was an obstacle to any resolution of this case. Following the mediation, on August 30, 2013, the Court received a Motion from Intertek,

---

[4] Although it is not uncommon to add or delete instructions based upon the trial testimony, it is quite unusual to drop or add entire theories of the case and counts of the case days/hours before the trial, which both parties did throughout these proceedings, which made for a more confusing and muddled procedural history.
[5] After the jury verdict, and the filing of the Post-Trial Motion, the Court scheduled another mediation before the Honorable Donald E. Ziegler. It was not successful. Doc. No. 294.

seeking leave to file an Amended Answer and Counterclaim, and asking to include the fact that at the mediation of this matter, Intertek actually bought the default judgment of $611,060.45 that Ace Hardware held against Plaintiff, leaving Intertek with a "setoff" which it wanted to include as a new Answer and Counterclaim.

On September 2, 2014, on the eve of originally scheduled trial, Brand filed a Motion for leave to file a Third Amended Complaint requesting to also include allegations related to the August 29, 2013 assignment of judgment. Because it was merely days/hours before the trial, among other reasons, the Court denied *both* parties' Motions to Amend their respective pleadings. Doc. No. 189.

However, unfortunately, on the morning of the scheduled trial, the Court was required to cancel the first trial in its tenure, due to illness. The Court rescheduled this trial for September 9, 2013. Because Brand had filed a Motion to Reconsider the Court's prior ruling denying the Motions to Amend Pleadings (doc. no. 191), the Court ordered the parties to meet and confer in an attempt to reach agreement on the effect of the settlement agreement and assignment of judgment.

Intertek then filed a Motion to Continue the trial date based upon unavailability of a witness, and this Court granted said Motion and reset the trial to begin on March 3, 2014. In light of the fact that the issue of untimeliness regarding the parties' Motions to Amend their Pleadings was no longer an issue, on September 6, 2014, the Court entered the following Text Order:

> TEXT ORDER on Motion to Reconsider (191). Both parties have asserted that the Settlement Agreement between Ace Hardware (Ace Hardware) and Defendant Intertek Testing Services, NA (Intertek) and the assignment of the Ace Hardware judgment to Defendant Intertek should be made an integral part of the case (doc. nos. 180 , 181 , 183 , 184 , 186 , 193 , and 194 ) in one way or

another. Upon further reflection; after consideration of Plaintiff's Motion (doc. no. 191), Defendant's Response in Opposition (doc. no. 193), and Plaintiff's Reply thereto (doc. no. 194); and with the postponement of the trial (doc. no. 195); this Court agrees, and therefore GRANTS Plaintiff's Motion for Reconsideration. Hereinafter, all issues relating to the Settlement Agreement, the assignment of the judgment, and the judgment itself (and any issues relating to the enforceability thereof) are made part of this action, including permitting the parties to refer to the fact that Defendant Intertek has obtained an assignment of the Ace Hardware Judgment. The parties may conduct discovery on the Settlement Agreement, the assignment of the judgment, and the judgment itself, which shall be completed on or before November 30, 2013. The parties shall file a status report thereon on or before December 7, 2013. Signed by Judge Arthur J. Schwab on 9-6-13. Text-only entry; no PDF document will issue.

On November 5, 2013, Defendant filed an Amended Counterclaim that included the Setoff Counterclaim. Notably, Intertek had originally stated it did not object to the fact that there was an assignment of the judgment and that it had bought the judgment, but stated that the amount paid for said assignment should be inadmissible. Specifically, Intertek has stated: "Defendant is not opposed to introducing the *fact* of the assignment of judgment, as Defendant itself has moved to amend its Answer and Counterclaim to reflect the same." Doc. No. 186, ¶ 7.

On January 31, 2014, Intertek filed a Motion in Limine (essentially a Motion to Reconsider) to exclude the settlement agreement from the trial of this matter. Plaintiff responded and quoted the above language from Defendant that the "fact of assignment of judgment" was admissible. Plaintiff also stated:

> [T]he assignment of judgment relates to the basic issue of who should be compensated for Intertek's negligent and fraudulent conduct, and by how much. The jury is entitled to know the details concerning the settlement agreement and the consideration for the assignment. Only then can the jury determine how it might fashion a verdict to compensate Plaintiff for his losses, without unintentionally rewarding Intertek instead.

Doc. No. 232.

On February 7, 2014, the Court denied Defendant's Motion (to Reconsider) to Exclude the Settlement Agreement. Doc. No. 233.[6] Thereafter, on February 19, 2013, Plaintiff filed a Motion to Withdraw the Claim of Fraudulent Misrepresentation, which this Court granted, thereby necessitating another change to the jury instructions and verdict slip, which now form the basis of Defendant's first argument relating to punitive damages.

The trial of this case commenced on March 3, 2014, and the case was submitted to the jury, after the final jury instructions were read to the jury, on March 5, 2014. It is important to note that Defendant did not make an objection to the jury instructions, as read, and responded with a "No" when this Court queried both parties on same. Doc. No. 284 at 172.

The jury reached its verdict on March 7, 2014. The jury found in Plaintiff's favor on the Negligent Misrepresentation Claim and found compensatory damages in the amount of $725,000.00 in past damages, $320,000.00 in future damages, and $5,000,000.00 in punitive damages. The jury also found in Defendant's favor on the Trademark Infringement Claim, but found the infringement was not willful and did not award any damages. The jury found in Plaintiff's favor on the remaining Counterclaims: that Brand did not fraudulently misrepresent itself to Intertek, and that Brand did not fraudulently conceal information from Intertek. The jury awarded no compensatory or punitive damages against Plaintiff.

On April 4, 2014, Defendant filed the instant Motion to Alter Judgment, for New Trial, and for Judgment NOV. Doc. No. 287. This Motion is now fully briefed.

---

[6] Defendant argued that the terms of the settlement agreement are inadmissible under Fed. R. Evid. 408, and because the Court had previously granted a prior Motion in Limine regarding Plaintiff's settlement agreement with prior party ProCom. Doc. No. 233. A further recitation of this procedural history is discussed in Section V(F).

### III. **Key Credibility Determinations Made by Jury**

### A. **Negligent Misrepresentation Claim**[7]

With respect to Plaintiff's Negligent Misrepresentation Claim, the jury necessarily made the following credibility determinations:

(1) That Intertek made material misstatements and misrepresentations: (a) about the ability and expertise *specifically* of its China facility, to test to all ANSI standards, and the product at issue here, despite knowledge that it had never performed safety testing to this particular ANSI standard; (b) that it provided "expert third party testing to almost any product safety standard, including ANSI"; (c) that its representatives specifically recommended that the testing of its product occur in China, despite Principal David O. Brand's initial belief that it would have been safer to have the products tested in Intertek's United States laboratory; (d) that Brand personally met with Intertek NA representatives at a hearth, patio and barbeque show, who informed him of Intertek's competence with this safety testing; (e) that he also received a sheet (P12) stating that "Intertek has been testing and certifying hearth products for over 20 years," and Intertek's website, which Brand reviewed, evidenced Defendant's expertise in testing for over 120 years; and finally, (f) that Brand had email exchanges with representatives of Intertek confirming much of the above, upon which he (and his company) justifiably relied to his detriment. See Doc. No. 283, at 25-33.

(2) Defendant's own expert witness on liability, Steven Roll, who Defendant retained despite his position as a former president of Intertek, testified to the errors in the testing,

---

[7] Under Pennsylvania law, a negligent misrepresentation claim has four elements: "1) a misrepresentation of a material fact; 2) made under circumstances in which the misrepresenter ought to have known its falsity; 3) with an intent to induce another to act on it; and 4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Smith v. Lincoln Ben. Life Co.,* 395 Fed. Appx. 821, 824 (3d Cir. 2010) (citing *Bilt–Rite Contractors, Inc. v. The Architectural Studio,* 581 Pa. 454, 866 A.2d 270 (2005)).

certification, and business process, including that in his professional opinion only one safety test was run on one of the models, despite the fact that there were three models numbers, two types of each (two different sources of fuel - - propane and natural gas), requiring at least three tests, if not six tests.  See Doc. No. 283 at 283; see also, defense exhibit D85).

 (3)  That Intertek failed in its duty to properly conduct safety testing of the Thermablaster:  (a) by using the wrong ANSI standards (outdoor gas grills); not performing any testing on certain models (immediately referenced above); by permitting or ignoring a communication break-down in terms of language barriers by the engineers; (b) that Plaintiff reasonably relied on one or more of these "mistakes" (by a supposed 'expert' which is why Plaintiff chose Intertek in China) to its own detriment by placing the order with Reecon for manufacture of the product which was ultimately distributed to Ace Hardware: (c) that these errors and material misrepresentations were the factual cause of the harm suffered.

(4)  Plaintiff's version of the timeline of the certification process was more credible than Defendant's witnesses (who offered no real explanation for the four month lapse between the July testing date and the supposed "final certification" report in November), and therefore, by crediting Plaintiff's version of the timeline, and its reasons for agreeing to have Intertek's China lab conduct the testing, "detrimental reliance" was established.

**B.**     **Trademark Infringement Counterclaim**[8]

Second, with respect to the Trademark Infringement Counterclaim, in finding in favor of Defendant and against Plaintiff on liability and against Defendant on damages, the jury

_____

[8] In order to be successful on its Trademark Infringement Counterclaim under the Lanham Act, Intertek must have shown by a preponderance of the evidence that: (1) Intertek owns the ETL trademark; (2) Intertek's trademark is a valid trademark; (3) that Brand used the ETL trademark in interstate commerce; and (4) that Brand used the ETL trademark in a manner that is likely to cause confusion or mistake as the approval of Brand's product. In this case, the parties stipulated to elements (1) and (2).

necessarily made the following determinations:

(1) Plaintiff was not authorized to use Defendant's trademark because the contract between Reecon and Intertek did not specifically include Brand's name; and (2) damages were not supported because Intertek submitted no evidence showing the "harm" that resulted therefrom.

(2) As for credibility of the Plaintiff, the jury must have found that while Reecon improperly affixed Defendant's ETL mark, the jury must have also found there was no harm flowing from Plaintiff's improper use of the mark because it did not award damages to Defendant.

## C.    Punitive Damages

Third, with respect to Plaintiff's Claim for Punitive Damages, in assessing punitive damages against Defendant, the jury necessarily must have made two credibility determinations against Defendant:

(1) That the misrepresentations Defendant made were more than just negligent, rather Defendant's entire business process in its safety testing, compliance and quality control techniques was reckless in that it amounted to nothing more than a "rubber stamp" and was grossly incompetent, and thus allowed this unsafe product to be put into the stream of commerce; and

(2) That the conduct of Defendant was outrageous, and the testimony of General Counsel John evidenced that these misrepresentations, made through its faulty business practices, were intended to be a "personal" attack on Plaintiff and to cause harm to Plaintiff.

## IV.    **Standards of Review**

Recently, in *Keifer v. Reinhart Foodservices*, LLC, 2013 WL 2558004 (W.D. Pa. 2013),

the Honorable Joy Flowers Conti, Chief Judge of the United States District Court for the Western

District of Pennsylvania, succinctly set for the following standards of review for Post-Trial

Motions pursuant to Fed. R. Civ. P. 50 and 59, which bears repeating:

> Rule 50(b) provides:
>
> (b) Renewing the Motion After Trial; Alternative Motion for a New
> Trial. If the court does not grant a motion for judgment as a matter of law made
> under Rule 50(a), the court is considered to have submitted the action to the
> jury subject to the court's later deciding the legal questions raised by the
> motion. No later than 28 days after the entry of judgment-or if the motion
> addresses a jury issue not decided by a verdict, no later than 28 days after the
> jury was discharged-the movant may file a renewed motion for judgment as a
> matter of law and may include an alternative or joint request for a new trial
> under Rule 59. In ruling on the renewed motion, the court may:
>
> > (1) allow judgment on the verdict, if the jury returned a verdict;
> > (2) order a new trial; or
> > (3) direct the entry of judgment as a matter of law.
>
> Fed. R. Civ. P. 50(b). Under Rule 50(b), the court must determine
> "whether 'viewing the evidence in the light most favorable to the nonmovant
> and giving it the advantage of every fair and reasonable inference, there is
> insufficient evidence from which a jury reasonably could find liability.' "
> *Eshelman v. Agere Sys., Inc*., 554 F.3d 426, 433 (3d Cir.2009) (quoting
> *Lightning Lube, Inc. v. Witco Corp*., 4 F.3d 1153, 1166 (3d Cir.1993)).
> "Although judgment as a matter of law should be granted sparingly, [the court
> shall] grant it where 'the record is critically deficient of the minimum quantum
> of evidence' in support of the verdict." *Eshelman*, 554 F.3d at 433 (quoting
> *Gomez v. Allegheny Health Servs., Inc*., 71 F.3d 1079, 1083 (3d Cir.1995)).
> The [United States Court of Appeals for the Third Circuit] has instructed that
> "[i]n performing this narrow inquiry, [the court] must refrain from weighing
> the evidence, determining the credibility of witnesses, or substituting [its] own
> version of the facts for that of the jury." *Eshelman*, 554 F.3d at 433 (quoting
> *Marra v. Phila. House. Auth*., 497 F.3d 283, 300 (3d Cir.2007)).
>
> *    *  *
> Rule 59 "addresses motions for a new trial under 59(a) or to alter or
> amend a judgment under 59(e)." *Graboff v. Colleran Firm*, Civ. No. 10–17–

10, 2013 WL 1286662, at *14 (E.D.Pa. Mar.28, 2013). Rule 59(a) provides:

(a) In General.

(1) Grounds for New Trial. The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:

(A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or

(B) after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.

Fed. R. Civ. P. 59(a). "A new trial may be granted 'when the verdict is contrary to the great weight of the evidence; that is where a miscarriage of justice would result if the verdict were to stand' or when the court believes the verdict results from jury confusion." *Brown v. Nutrition Mgmt. Servs. Co.,* 370 F. App'x 267, 268–70 (3d Cir.2010) (quoting *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir.2001)).

＊ ＊ ＊

Fed. R. Civ. P. 59(e). A motion to alter or amend a judgment, also known as a motion for reconsideration, filed under this rule is ordinarily granted only (1) if there is "an intervening change in the controlling law," (2) it involves the presentation of "new evidence" that was not available at the time of the ruling in question, or (3) to address the "need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe v. Quinteros*, 176 F.3d 669, 677 (3d Cir.1999). Similar to motions filed pursuant to Rule 50(b), " '[b]ecause of the courts' interest in the finality of judgments, motions for reconsideration should be granted sparingly.' " *Graboff*, 2013 WL 1286662, at *15 (quoting *Tomasso v. Boeing Co.*, Civ. No. 03–4220, 2007 WL 2458557, at *2 (E.D.Pa. Aug.24, 2007)).

## V.    Discussion

The Court will apply the above-stated narrow and exacting standards of review for Post-Trial Motions pursuant to Fed. R. Civ. P. 50 and 59 to the instant matter.

### A.    Plaintiff's Punitive Damages Claim Was Correctly Submitted to the Jury

Perhaps because the largest portion of the verdict was punitive damages, Defendant first argues that the evidence of record was not sufficient to create a factual question on Plaintiff's claim for punitive damages.[9] This argument is unconvincing.

### (1)    Procedural History Relative to Punitive Damages

At the outset, the Court notes that Plaintiff requested punitive damages in its Complaint and Amended Complaints. On February 19, 2014, just ten days prior to the trial, and months after the jury instructions were drafted with punitive damages charges included for *both* the Claims and Counterclaims, Plaintiff filed a motion to withdraw its claim for Fraudulent Misrepresentation, and to proceed only on Negligent Misrepresentation. Doc. No. 234. On February 20, 2014, this Court granted said Motion. On February 25, 2014, the Court set forth yet another version of the Final Jury Instructions and Verdict Slip, and ordered new objections to be filed by February 28, 2014 (the last working day before the trial). Doc. Nos. 246 and 247.

On February 28, 2014, Defendant filed objections to the Final Jury Instructions and the Final Verdict Slip arguing, *inter alia*, that the issue of punitive damages should not be submitted to the jury. Doc. Nos. 256 and 257. However, as Plaintiff responded, and this Court agreed, the Supreme Court of Pennsylvania, in the bellwether case of *Hutchinson v. Luddy*, has held that a

---

[9] In its briefing, Defendant does not acknowledge that this Court also permitted the question of punitive damages on all three of Defendant's Counterclaims to go to the jury. After hearing all of the evidence, the Court was not as convinced that Defendant had advanced sufficient facts to support a finding of recklessness, yet, the Court, out of fairness to both parties, and in deference to the important fact finding function of the jury, decided to allow the question of punitive damages to proceed to the jury on Defendant's Counterclaims as well. The jury was well within its discretion to decline an assessment of punitive damages against Plaintiff, as it did.

plaintiff is always permitted to attempt to prove conduct that warrants the imposition of punitive damages in a case for negligence. *Hutchinson ex rel. Hutchinson v. Luddy,* 870 A.2d 766 (Pa. 2005).

In *Luddy*, the Supreme Court of Pennsylvania specifically held that, "[n]either is there anything in law or logic to prevent the plaintiff in a case sounding in negligence from undertaking the additional burden of attempting to prove, as a matter of damages, that the defendant's conduct not only was negligent but that the conduct was also outrageous, and warrants a response in the form of punitive damages." *Id*. at 772. The Court in *Luddy*, went on to conclude that "we reject the Superior Court's conclusion that punitive damages are unavailable, as a matter of law, in an action for negligent supervision." *Id.* at 773.

With this case law in mind, on the morning of the trial, the Court then entered the following Text Order:

> ORDER OVERRULING 257 Objections to Final Verdict Slip and 256 Objections to Final Jury Instructions, filed by INTERTEK TESTING SERVICES, N.A. INC. The issue of whether punitive damages may be submitted to the jury is decided by the Court at the conclusion of the evidence. Furthermore, just because Plaintiff chose to streamline its case and dismissed his claim for fraudulent misrepresentation does not equate to a decision to drop its request for punitive damages under the law of negligent misrepresentation, as punitive damages are available for negligence claims. *See Hutchison v. Luddy*, 870 A.2d 766 (Pa. 2005).

If the Supreme Court of Pennsylvania found it appropriate to hold that a Plaintiff in action sounding in negligence (in that case a negligent supervision claim) was not prevented or barred from undertaking the additional burden to demonstrate outrageous conduct (with reckless indifference to others), then this Court could saw no reason why *either* party should have been precluded from at least attempting to offer evidence of outrageous conduct (either with an evil motive or with reckless indifference to the rights of others).

At the conclusion of the presentation of evidence at trial, both parties orally motioned the Court in regard to Plaintiff's punitive damages claim. After hearing both sides' arguments citing reckless conduct, or lack thereof, the Court granted Plaintiff's motion to include punitive damages, and stated that there was "more than sufficient evidence to show that this whole process was recklessly handled . . . certainly there's enough to establish that matter - - for the jury to determine." Doc. No. 284 at 91. Finally, the Court notes that Defendant voiced no objection to the jury instructions as a whole, and as read. Specifically, the Court asked, "[a]ny objections to the jury instructions as I've read them on behalf of Plaintiff? To which, Plaintiff responded: No, Your Honor. And the Court then asked "Defendant?" To which Defendant answered "No." Doc. No. 284, at 172.

### (2)    Case Law, Although Not Superfluous, Supports this Court's Decision to Allow Punitive Damages to be Decided by the Jury

In its Post-Trial Motion, Defendant places great emphasis on the lack of decisions wherein punitive damages were submitted to a jury on a Negligent Misrepresentation Claim. Defendant exclaimed "[w]e have not found a single case, anywhere in the United States, in which a plaintiff was permitted to recover punitive damages in a negligent misrepresentation case. The rare plaintiff who have asked for it have been rebuffed." Doc. No. 288. In support thereof, Defendant cites two United States District Court of Colorado cases, and a 1986 Kansas Supreme Court case. Id. at 3. *See Elliott v. Aspen Brokers, Ltd.*, 811 F.Supp. 586, 591 (D. Colo. 1993); *Rosales v. AT & T Info. Sys. Inc.*, 702 F.Supp. 1489, 1501 (D. Colo. 1988); *Johnson v. Geer Real Estate Co*., 720 P.2d 660, 665 (1986).

In the opening line of its responsive brief, Plaintiff answers with the following:

> [I]n Pennsylvania, "a claim for negligent misrepresentation can support a claim for punitive damages." *Howe v. LC Philly*, LLC, 2011 U.S. Dist. LEXIS 41534 *20, n. 10 (2011) citing *Browne v. Maxfield*, 663 F. Supp. 1193, 1205-05 [sic] (E.D. Pa. 1987)) (finding sufficient evidence to support a claim for punitive damages on a remaining negligent misrepresentation claim). Futhermore, though Intertek suggests otherwise, research shows that a myriad of court from other jurisdictions have approved awards for punitive damages based on negligent misrepresentation or held that such a claim for punitive damages is a question for the jury.

Doc. No. 292.

In support of this position, Plaintiff cites three cases, one from the high court of Alaska, a 2012 decision by the Missouri Court of Appeals, and another from the Southern District of Indiana, also in 2012, where punitive damages in a negligent misrepresentation action were approved. *See Clara Ins. Agency v. Doyle*, 620 F.2d 194, 201-04 (Alaska 1980); *Bailey v. Hawthorne Bank*, 382 S.W. 3d 84, 105 (Mo. Ct. App. 2012) (reinstating jury's punitive damages award of $200,000.00 on negligent misrepresentation claim); *JMB Mft. Inc., v. Child Craft, LLC*, 2012 WL 5397597 (S.D. Ind. 2012).

Neither the Supreme Court of Pennsylvania nor the United States Court of Appeals for the Third Circuit, have addressed the applicability of punitive damages in a negligent misrepresentation context. The Court can see no valid reason why the principles set forth in the *Luddy* case would not be applicable to a Negligent Misrepresentation case, especially because it is a form of negligence. This Court is mindful that the Court in *Luddy* announced:

> [T]he fact that a cause of action bottomed on negligence does not require proof of the heightened showing of culpability necessary to sustain punitive damages in order to secure the underlying compensatory damages does not mean that punitive damages - as an element of damages - should be deemed automatically unavailable, even if the conduct of the defendant(s) went well beyond negligence and into the realm of the outrageous. The penal and deterrent purpose served by an award of punitive damages is furthered when

22

the outrageous conduct occurs in a case sounding in negligence no less than when an intentional tort is at issue.

 We do not dispute that a showing of ordinary negligence is not enough to warrant punitive damages. And so, a jury cannot be instructed that, having found negligence, an award of punitive damages is appropriate. But, neither is there anything in law or logic to prevent the plaintiff in a case sounding in negligence from undertaking the additional burden of attempting to prove, as a matter of damages, that the defendant's conduct not only was negligent but that the conduct was also outrageous, and warrants a response in the form of punitive damages.

*Luddy* at 772.

In reserving the decision of whether to allow the question of punitive damages should be presented to the jury until the conclusion of the evidence, this Court has taken heed of the above quoted pronouncements of the Supreme Court of Pennsylvania. Furthermore, other District Courts within this Commonwealth have recognized the right of a Plaintiff to seek punitive damages in a negligent misrepresentation claim (as set forth in Plaintiff's briefing). *Howe v. LC Philly*, LLC, 2011 WL 1465446, n. 10 (E.D. Pa. 2011) (citing *Browne v. Maxfield*, 663 F. Supp. 1193, 1205 (E.D. Pa. 1987)). Moreover, there are other recent court decisions from another state appellate court and a District Court that has found a verdict of punitive damages in a negligent misrepresentation case was warranted. *Bailey v. Hawthorn Bank*, 382 S.W. 3d 84 (Mo. App. W.D. 2012)(reversing trial court's JNOV of punitive damages on negligent misrepresentation claim); *JMB Manufacturing Inc., v. Child Craft, LLC*, 2012 WL 5397597 (S.D. Ind. 2012).

**(3)     A Successful Claim for Punitive Damages Requires a Showing of Outrageous Behavior, Such as Reckless Disregard to the Rights of Others**

In order to succeed on a claim of punitive damages, Plaintiff must establish that Defendant had a subjective appreciation of the risk of harm to Plaintiff from his/her action and secondly, that Defendant has acted, or failed to act, in conscious disregard of the risk to Plaintiff. *Luddy*, 870 A.2d at 770.

A Court may not award punitive damages based upon a finding of mere negligence, rather, Plaintiff must set forth evidence establishing that Defendant acted outrageously, either because of an evil motive, or where, as here, ***out of reckless indifference to the rights of others***. *Phillips v. Cricket Lighters*, 883 A. 2d 439, 445 (Pa. 2005)(emphasis added). A defendant acts recklessly when "his conduct creates an unreasonable risk of physical harm to another [and] such risk is substantially greater than that which is necessary to make his conduct negligent." *Luddy,* at 771 (citation omitted).

As the United States Court of Appeals for the Third Circuit stated in *Tunis Bros. Co., Inc. v. Ford Motor Co*., 952 F.2d 715, 740 (3d Cir. 1991):

> "[T]he decision of whether to award punitive damages and the amount to be awarded are within the discretion of the fact finder," *Delahanty*, 318 Pa.Super. at 129, 464 A.2d at 1263 (citations omitted), the legal and factual prerequisite for an award of punitive damages is outrageous conduct. *See Feld v. Merriam*, 506 Pa. 383, 395, 485 A.2d 742, 748 (1984) (adopting the Restatement (Second) of Torts, § 908(2), concerning the imposition of damages); *Martin v. Johns–Manville Corp*., 508 Pa. 154, 169, 494 A.2d 1088, 1096 (1985) (plurality decision). The Restatement provides, in pertinent part: Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or ***his reckless indifference to the rights of others***. In assessing punitive damages, ***the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant***. Restatement (Second) of Torts, § 908(2). The first factor required for punitive damages—outrageous conduct— rests upon the purpose of punitive damages to deter and punish such conduct. *Kirkbride v. Lisbon Contractors, Inc.,* 521 Pa. 97, 100, 555 A.2d 800, 802 (1989); Restatement

(Second) of Torts, § 908 comment b. As explained by the Supreme Court of Pennsylvania in *Kirkbride*, three factors are to be considered in awarding punitive damages:  1) the character of the act; 2) the nature and extent of the harm, and 3) the wealth of the defendant.

(emphasis added).

**(4)**     **Plaintiff Has Set Forth Competent Evidence of Reckless Indifference**

Plaintiff has adduced sufficient evidence from which a reasonable jury could find that Defendant acted with reckless indifference of a risk of harm.  Specifically, the following facts handily met the evidentiary threshold of recklessness, and support both the inclusion of punitive damages on the verdict slip and the jury's award:

(a) Intertek admitted during trial that it knew or had reason to know of the high degree of risk of physical harm to the public and the following facts evidence its reckless indifference thereto:

(i)  Intertek advertised expertise in testing to any ANSI standard, when it knew it had never performed the safety testing required by Thermablaster, and its representatives convinced Plaintiff that the China testing and certification facility was the best suited for performing the safety testing in a safe and efficient manner.  Doc. No. 282 at 74-75; Doc. No. 283 at 33-34. When asked whether its customers deserved to know that it had never done that safety test before, Curkeet testified, "[t]here's no requirement to disclose that without being asked.  I don't think it would be particularly helpful in making sales." Id. at 75, lines 15-17.  Its competitor, however, had safely performed the testing to that standard.

(ii) Curkeet testified that he was Intertek's representative on the committee of 20 people that drew up the safety standards at issue (for hearth products), and that the universal heater

category made the evaluation process "even more complicated."  Id. at. 134-136, and 97.  Yet, Curkeet never visited the lab where the engineers tested the Thermablaster, and he never told the testing engineers in China to call him first rather than attempting to interpret the standard on their own.  Id. at 59, 134-135.  Yet, Defendant's sales representatives misrepresented to Brand that the China laboratory had the most expertise in testing this particular product.

(iii)  Curkeet explained that the management of the translation issues between the English and Chinese standards is "very difficult to manage, and it's not always done.  It's a goal, but it's certainly, like I said, not perfect."  Id. at 92.  Further, when queried in his video deposition (that was played to the jury), "in reviewing what occurred in this case, do you feel that anything got lost in translation in the interpretation of this standard by the Guangzhou engineers?,"  Curkeet answered, "I believe so, yes."  Id. at 92.  Curkeet admitted then, that he knew the engineers' grasp of the English language was less than perfect but never updated the forms which could assure that the engineers did not overlook any of the additional tests required under the new standard.  Id. at 90.  He knew the engineers understanding of the English language was less than perfect, and he was only engineer at Intertek who was familiar with this new, "complicated" standard for testing of heaters with the potential to cause death in the form of carbon monoxide poisoning, and potentially dangerous fires.  Yet, although it was his conclusion that the engineers did not perform certain aspects of the safety testing at all, he passed the heaters anyways (also despite the fact that they did not in fact comply with safety standards).  Curkeet testified that he believed due care was lacking, in this and in other regards.  Id. at 122-123 (lines 25 and 1).

(iv)  As discussed in the Credibility Determinations subsection (III.A), Defendant's own liability expert, who was a former president of Defendant, testified on cross-examination to the many other errors acknowledged by Curkeet (Doc. No. 283 at 274-75), and stated that the

Chinese engineer made a "big" mistake in the interpretation of the standards. Id. at 275. Defense expert Roll also provided damning testimony, that the testing data "implies" that only one out of six required tests were performed by the engineers. Doc. No. 283 at 281.

(v) The testimony was given that Intertek, despite being one of the "biggest" of the roughly one dozen safety testing companies in the world, Id. at 84, tested the Thermablaster to the wrong safety standards (outdoor grills), and that it knew it was never allowed to test to a different standard then what was required, in order to "make sure that all the issues that could create safety hazards are properly covered." Id. at 85. As rehearsed, Intertek was aware that these heaters could pose a threat of "carbon monoxide, fire, personal injury, gas leakage," "in people's homes."

To summarize, Plaintiff presented evidence to establish that the testing was performed by persons who did not fully comprehend English standards, and who did not perform many of the tests required for the product (per the testimony of defense expert, Roll). Alarmingly, Defendant tested to wholly inapplicable safety standards - - testing this home indoor heater to an outdoor barbecue grill standard. Executives permitted other persons without full authority to sign off on test reports (rubber stamp), and Curkeet admitted that someone at Intertek should have known of this system breakdown (that the regulator test was wrong, that the five-minute shut-off was wrong, no natural gas was tested to, and the wrong standards used in the sheets to do the testing). Curkeet also admitted that Intertek has a history of engineers "slacking off on the job and saying things complied without running the safety test," Id. at 132 and that "[their] evaluation was woefully inadequate." Yet, Curkeet testified that all these errors and lapses in the business process were "immaterial" to the fact that Plaintiff "put unsafe units on the market . . . and he put [their] mark on them." Id. at 133. The jury, however, obviously disagreed with his assessment

and found that Defendant's (reckless) actions caused the damages at issue.

While Defendant posits that the "jury could only have based a conclusion that Intertek consciously disregarded the risk that Plaintiff might rely on the July 2011 Test Data Sheets on fantasy," this Court disagrees. The evidence elicited by Plaintiff, as recounted above, demonstrated that the several key components of the testing, certification, and business process of Defendant for the testing of this product were so seriously flawed that it moved beyond mere negligent misrepresentations to warrant a finding of recklessness.

**B.      The Jury's Assessment of Punitive Damages Is Not Grossly Excessive**

Defendant alternatively argues that the punitive damages award is grossly excessive or arbitrary and violates the Due Process Clause of the Fourteenth Amendment. *Cooper Indus. Inc., v. Leatherman Tool Group,* 532 U.S. 424, 433 (2001). Defendant moves this Court to order a new trial or to remit the punitive damages award of $5 million, and to take away the critical credibility determinations of the jury, on the basis that a 1:1 ratio is more appropriate in this case.

When examining whether an assessment of punitive damages complies with the Due Process Clause, the Court shall look to the following factors or guideposts: (1) the degree of reprehensibility of Defendant's conduct; (2) the disparity between the actual or potential harm by Plaintiff and the punitive damages award; and (3), the difference between the punitive damages awarded in this case versus other comparable cases. *BMW of North America v. Gore*, 517 U.S. 559, 575 (1996)

As the United States Supreme Court set forth in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003):

> "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S., at 575, 116 S.Ct. 1589. We have instructed courts to determine the

28

reprehensibility of a defendant by considering whether: ***the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.*** *Id*., at 576–577, 116 S.Ct. 1589. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. *Id*., at 575, 116 S.Ct. 1589.

(emphasis added).

### (1)    The Measure of Reprehensibility of Conduct, and the Five Subfactors Weigh in Favor of Punitive Damages

In determining whether Defendant's conduct is reprehensible such that an award of

punitive damages is justified in this case (under guidepost number one set forth hereinabove in

*Gore*), the Court will examine the five subfactors:

(1) whether the harm caused was physical as opposed to economic;

(2) whether the tortious conduct evinced an indifference to or a reckless disregard of the

health or safety of others;

(3) whether the target of the conduct had financial vulnerability;

(4) whether the conduct involved repeated actions or was an isolated incident; and,

(5) whether the harm was the result of intentional malice, trickery, or deceit, or mere

accident.

The first subfactor weighs in favor of Defendant: whether the harm was physical rather

than economic, because the damage to Plaintiff was economic.  However, the second, third, and

fourth subfactors: whether the tortious conduct evinced an indifference to or a reckless disregard

of the health or safety of others; whether the target of the conduct had financial vulnerability; and whether the conduct involved repeated actions or was an isolated incident, all weigh in favor of Plaintiff. Finally, the fifth subfactor, whether the harm was the result of intentional malice, trickery, or deceit, or mere accident, is neutral.

Defendant hangs its hat on the position that the injury to Plaintiff did not result from intentional malice, trickery or deceit (subfactor number five), but in its brief, it fails to address sub-factor number two. As this Court has stated *infra*, the evidence was more than sufficient to establish that the injury occurred through the reckless conduct of Defendant - - conduct that evidenced an indifference to Plaintiff's rights and the safety of consumers. While perhaps one error in the testing process could be construed as simply an "honest mistake" that would not warrant a finding of recklessness, as Defendant's witnesses Curkeet and Roll testified, there were numerous errors made during the testing and business process (testing to wrong standards, failing to perform five out of six tests, employing testers who did not understand English, having others sign off on the product with no expertise or real authority to do so, and catching engineers slacking off on the job). At some point along the continuum, the numerosity of errors in the testing, and business process of Defendant establishes a subjective appreciation of the risk[10] and a careless or reckless disregard for the testing and certification process upon which Plaintiff detrimentally relied, one in which Defendant claimed to be an "expert," but evinces anything but

---

[10] In the opening lines of its Reply Brief, Defendant asks to Court to find that it did not subjectively recognize and disregard an "entire series of improbable risks." Doc. No. 292. On the contrary, the testimony established that these risks were far from improbable - - they were more than reasonably foreseeable. Being one of the leading safety testing companies in the world, and using such faulty business processes and safety testing processes, and yet being *surprised* that a business such as Brand Marketing would rely on these material misrepresentations and would induce them to sell heaters to the consuming public, equates to a subjective recognition of risk of harm by Intertek, and a reckless disregard of an entire series of risks. Rather, the testimony established that Intertek subjectively recognized (albeit arguably not with an evil motive) a series of highly probable risks of catastrophic consequences - - and the only fortune is that these risks were realized only by financial harm to Plaintiff, rather than harm to the consuming public.

expertise. The trial testimony handily established that the safety testing and the business and quality control processes that accompanied it were akin to a rubber stamp being placed on a product that was not safe, did not comply with ANSI standards, and should not have been in the marketplace. The evidence also revealed that it was only a competitor of Plaintiff that alerted Defendant of the fact that the product did not comply with the ANSI standard, rather than Defendant's own quality control process.

When a leading safety testing company like Intertek tests a product such as this, it is required to do so in a manner that does not jeopardize the health and safety of consumers who ultimately have these products in their home. Defendant argues that the Consumer Product Safety Commission (CPSC) ultimately determined that it did not warrant Commission intervention; however, that does not negate the fact that the product was not compliant with the safety standards and certainly was at risk for catastrophic consequences had these non-conforming products remained in the stream of commerce.[11] Therefore, with regard to the second factor, the evidence demonstrated that the Defendant's tortious conduct evinced indifference or a reckless disregard to Plaintiff's rights and of the health or safety of others, and thus supports an award of punitive damages against Defendant.

Regarding the third factor, the target of the conduct, Brand Marketing, had financial vulnerability – and the testimony at trial established that the business relationship Brand had formed with Ace was his "big break," that he had lived modestly for years leading up to this "big sale," when his heaters were voluntarily recalled because of Defendant's flawed testing, his business relationship with Ace destroyed, and a default judgment obtained by Ace against

---

[11]David Brand testified that once he found out the products were non-compliant, he self-reported the issue to the CPSC, he personally contacted a customer who installed the unsafe heaters into consumers' homes and told them not to use them unless they were installed professionally, and he participated in a voluntary recall of said product. Doc. No. 283, at 81, 83 Doc. No. 284 at 71-73.

Plaintiff to the tune of $611,000.00 (one that Intertek bought). Doc. No. 283 at 15. Days before

the originally scheduled trial (September 2013), Intertek bought the outstanding default judgment

from Ace and as of March 2014, the testimony at trial established that Intertek was attempting to

execute personally on David Brand. The jury was free to consider, and infer that the judgment

Intertek obtained over Plaintiff was the result of Intertek's own misconduct, and that Plaintiff

was financially vulnerable, and Defendant attempted to exploit its vulnerability. This subfactor

weighs in favor of an assessment of punitive damages against Defendant.

As to the fourth subfactor, the trial testimony demonstrated that Intertek's conduct in this

case was not an isolated incident. Curkeet testified that he has seem some "pretty major

mistakes" and "sloppy work," over the years, including engineers who did slacked off on the job

and "saying things complied without running the test." Id. at 131-132. While Curkeet also

testified that "*usually . . .* when we've had those issues, they've never gotten all the way through

the process to a certification," and that he fired people who slacked off, the jury was able to

reasonably conclude, by judging his demeanor during his testimony, that although "usually"

products did not improperly clear the certification process, there were other instances where

potentially dangerous products were allowed to enter the marketplace, due to the reckless

conduct of Defendant. Additionally, it is important to consider not only the potential harm that

Defendant's conduct could have caused the Plaintiff (*i.e.* his unsafe product causing damage or

personal injury to consumers), but also "the possible harm to other victims that might have

resulted if similar future behavior were not deterred." *TXO Prod. Cor. v. Alliance Res. Corp.,*

509 U.S. 443, 460 (1993) (United States Supreme Court found a punitive damage award of $10

million against oil and gas developer on a common law slander claim was no "so grossly

excessive" as to violation due process even though actual damage award was only $19,000).

Finally, with respect to subfactor number five, that the conduct did not result from intentional trickery or deceit, both parties make convincing arguments on this point. While there is little record evidence that Defendant *purposefully* intended to deceive or trick Plaintiff about its expertise in safety testing, Plaintiff raised the point that there was evidence that the fact that Defendant held itself out as an expert, all the while knowing it was incompetent to test to this safety standard, which weighs in favor of a finding of punitive damages. The Court need not resolve subfactor five one way or the other, as numerous other factors favor Plaintiff on the issue of reprehensibility of conduct.

> **(2)** **The Disparity Between the Harm Suffered by Plaintiff and the Punitive Damages Award Is Not So Great As To Be Unreasonable, and the Difference Between the Punitive Damages Award in This Case Versus Other Comparable Cases Does Not Justify A Reduction**

While the United States Supreme Court has declined to impose a "bright-line ratio which a punitive damages award cannot exceed, it has instructed that 'few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.'" *Campbell,* 538 U.S. 408, 425 (2003).

The jury heard evidence of the harm suffered by Plaintiff and heard the total equity number of Defendant was in excess of $89,000,000 in the year in question, which is certainly one valid measure of punitive damages. The jury assessed a punitive damages award of $5,000,000.00, which when compared to compensatory damages award of $1,045,000.00, is slightly less than 5:1. As the Supreme Court stated in *Gore,* a ratio of slightly less than 5:1 is by no means disproportionate. Instead, it is well within the permissible single-digit ratio addressed by the United States Supreme Court in *Campbell*, and the ratio is *far lower* than the 10:1 ratio upheld in *TXO*. 509 U.S. at 460.

In *Gore*, the United States Supreme Court set forth than an award of punitive damages "more than 4 times the amount of compensatory damages, did not 'cross the line' into the area of constitutional impropriety." *Gore*, 517 U.S. at 581 (citing *Haslip*, 499 U.S. at 23-24). The United States Supreme Court in *Gore* also noted that the proper inquiry is, "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from defendant's conduct as well as the harm that actually has occurred." *Id.* Here, the trial testimony established that Intertek knew the risk to public safety was considerable, but failed to take any precautions to ensure that the safety testing was done correctly and acted recklessly, despite having the great responsibility to test a potentially dangerous product for compliance to a safety standard that it had never tested to before. Finally, a new trial or remitter will only be granted when the disparity between the punitive and compensatory damages is so grossly excessive as to shock the judicial conscience. *William A. Graham Co. v. Haughey*, 646 F.3d 138, 142 (3d Cir. 2011). This is not the case here.

   **C.**     **The Jury's Assessment of Compensatory Damages Is Supported by Sufficient Evidence**

   Although Defendant raised the argument that the economic loss doctrine acts as a bar to Plaintiff's claim for compensatory damages only at the Motion to Dismiss stage of this litigation, it now attempts to argue that Plaintiff's claim for damages is barred by the doctrine. The doctrine "provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damages." *Sovereign Bank v. BJ's Wholesale Club, Inc.* 533 F.3d 162, 175 (3d Cir. 2008). However, as the Court previously held on the Motion to Dismiss, there are certain exceptions to the bar, including under Restatement (Second) of Torts § 552. In its Memorandum Opinion on the Motion to Dismiss, this Court discussed this

issue and implicitly invited Defendant to re-raise this argument on summary judgment.

Defendant failed to do so. The Court stated as follows:

> [D]efendant next argues that the economic loss doctrine bars plaintiff's negligence claims (Count I and Count V). However, since plaintiff has agreed to dismiss its negligence claim at Count V of the Amended Complaint (see doc. no. 33), the Court will examine only plaintiff's claim for negligent misrepresentation under the Restatement of Torts § 552 (Second).[12]
>
> Under Pennsylvania law, "the economic loss doctrine . . . precludes recovery in tort if the plaintiff suffers a loss that is exclusively economic, unaccompanied by an injury to either property or person." *Bouriez v. Carnegie Mellon Univ.*, 430 F. App'x 182, 187 (3d Cir. 2011) (citing *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841 n.3 (Pa. 2009)). "Pennsylvania has not limited the applicability of the economic loss doctrine to situations in which the parties are bound by a contractual relationship or are otherwise in privity with one another." *Id.* "Pennsylvania has, however, carved out an exception to the economic loss doctrine for claims of negligent misrepresentation asserted pursuant to Section 552 of the Restatement (Second) of Torts." *Id.* (citing *Excavation Techs.*, 985 A.2d at 840). Thus, the question is "whether [Intertek] owe[d Brand] a duty pursuant to Section 552, as such a duty would preclude the application of Pennsylvania's economic loss doctrine." *Id.*

---

[12] Section 552 provides:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> > (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
> >
> > (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
>
> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Defendant cites to *Excavation Techs., Inc. v. Columbia Gas Co of Pa.*, 936 A.2d 111, 113-16 (Pa. Super. Ct. 2007) in support of its claim that Section 552 only applies to design professionals. However, the Pennsylvania Supreme Court did not adopt the reasoning of the Superior Court when the case was appealed. *See Excavation Techs.*, 985 A.2d at 841.

In *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, the Pennsylvania Supreme Court stated that the Section 552 exception applies "where information is negligently supplied by one in the business of supplying information, *such as* an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information." 866 A.2d 270, 286 (Pa. 2005) (emphasis added). Thus, it is possible for Section 552 to apply to non-design professionals. *See First United Bank & Trust v. PNC Fin. Servs. Grp., Inc.*, 667 F.Supp.2d 443, 457 (M.D. Pa. 2009) (applying § 552 exception to a financial institution); *Comcast Spectacor L.P. v. Chubb & Son, Inc.*, 2006 WL 2302686, *22 n.33 (E.D. Pa. Aug. 8, 2006) (applying § 552 exception to an insurance broker).

Plaintiff's Amended Complaint pleads sufficient facts to state a cause of action for negligent misrepresentation. Specifically, the Amended Complaint sufficiently pleads that Intertek supplied false information during the course of its business for Brand's use during the course of Brand's business transactions. Furthermore, the Amended Complaint sufficiently pleads that Brand justifiably relied upon Intertek's representations. **The Court will decline to dismiss Count I at this early stage of the litigation. *See First United*, 667 F.Supp.2d at 457 ("Construing the complaint in the light most favorable to [plaintiff], the Court finds that the allegations are sufficient at this early stage of the case to state a negligent misrepresentation claim that fits under the narrow exception to the economic loss rule announced in *Bilt–Rite*.").**

Doc. No. 36 at 8-10 (emphasis added).

Defendant never re-raised this issue on Summary Judgment Motion, in a Motion in Limine, or at any other time during these pretrial or trial proceedings. Notwithstanding the Court's view that Defendant had abandoned this argument, Defendant argument still misses the mark.

Plaintiff was entitled to bring a claim under Section 552, under what is known as the *Bilt-Rite* exception. The District Courts within this Circuit have recognized that the *Bilt-Rite* exception applies to a narrow class of negligent misrepresentation, "where information is negligently supplied by one in the business of supplying information . . . . and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of the information." *First Sealord Sur. v. Durkin & Devries Ins. Agency*, 918 F.Supp.2d 362, 378-79 (E.D. Pa. 2013) (citing Section 552 of Restatement (Second)); *Partners Coffee Co. LLC v. Oceana Services and Products Co.,* 700 F.Supp.2d 720 (W.D. Pa. March 25, 2010); *Matlack Leasing,LLC v. Morison Cogen*, LLP, 2010 WL 114883 (E.D. Pa January 13, 2010)).

Also, to the extent that Defendant now argues that the jury instructions on compensatory damages were "self-contradictory" because the Court stated at one point that the measure of damages is actual loss, not benefit or value of the bargain, again, Defendant specifically stated that it had no objection to the jury instructions, because upon questioning by the Court about whether there was any objection to the instructions immediately after giving them to the jury, Defendant answered "No."[13]

Moreover, the Court's statement of the law of compensatory damages was accurate. While Defendant now argues that benefit of the bargain, and future profit damages (plus punitive damages) are all outside the scope of Restatement (Second) of Torts § 552B, it fails to cite a single case from this jurisdiction to support its argument.

---

[13] At Doc. No. 284 at p. 172, the Court asked "Any objections to the jury instructions as I've read them on behalf of Plaintiff? To which, Plaintiff responded: No, Your Honor. And the Court then asked "Defendant?" To which Defendant answered "No."

Defendant instead cites Comment b, to Section 552B(2) in support of its position that Plaintiff may not recover damages that give it the benefit of its contract with Ace Hardware. Section 552B(2) states as follows: "[t]his Section rejects, as to negligent misrepresentation, the possibility that, in a proper case, the plaintiff may also recover damages that will give him the benefit of his contract *with the defendant*." (emphasis added). In Defendant's brief, it neglects to mention the above pivotal and decisive italicized phrase: *with the defendant*. Therefore, Comment b only prohibits a plaintiff from realizing the benefit of its contract with defendant, here Intertek, presumably because such damages are recoverable under the alternative theory of breach of contract. The contract at issue from which damages arose was with Ace, who was not a party to this action, and *because Brand never had a contract with Intertek, Section 552B(2) and Comment b are not applicable*.

In reality, Section 552B(1)(b) permits Plaintiff to recover damages that give him the benefit of his contract with Ace, and Plaintiff's claim was for consequential damages in the form of the Ace judgment, not benefit of the bargain damages.[14] Section 552B also allows a recovery of lost profits from Plaintiff's failed business relationship with Ace that Defendant, through its negligent misrepresentation, has caused to be damaged (ceased). Indeed, Section 552B(1)(b) specifically allows recovery of "pecuniary loss suffered otherwise as a consequence of [Plaintiff's] reliance upon the misrepresentation."[15] Pennsylvania recognizes that lost profits are consequential damages. *AM/PM Franchise v. Atlantic Richfield*, 584 A.2d 915, 920 (Pa. 1990). Accordingly, the profits that Plaintiff lost from its failed relationship with Ace are recoverable under Section 552B.

---

[14] As set forth in Section V(E), the Court will grant the motion for equitable set-off and Defendant's assignment of the judgment, and by granting this set-off, is thereby reducing these "consequential damages."

[15] As the phrase "consequential damages" implies, these are damages or "losses that do not flow directly and immediately from an injurious act, but that results indirectly from the act." Black's Law Dictionary (7th Ed.) at 394.

### D.  The Liability Verdict Was "Consistent"

The jury found that Plaintiff non-willfully infringed Defendant's trademark.  It did not

assess any damages as a result.  Intertek contends that because Brand's Trademark Infringement

arguably could have caused Brand's injuries, the jury's determination that Intertek responsible

for the harm is inconsistent.  Intertek states "no rational jury could have found both that

Intertek's alleged misrepresentation caused Plaintiff's damages and that Plaintiff infringed

Intertek's trademark."  Doc. No. 288 at p. 4.  This argument ignores the basic tenets of factual

causation.  This Court instructed the jury with regard to Plaintiff's Claim [and Defendant's

Counterclaims], in conformance with the Pennsylvania Standard Civil Jury Instructions and

Courts of this Commonwealth, as follows:

> [I]n order for Brand to recover in this case, Intertek's negligent conduct must
> have been a factual cause in bringing about harm. In order for Brand to recover
> in this case, Intertek's negligent conduct must have been a factual cause in
> bringing about harm. Conduct is a factual cause of harm when the harm would
> not have occurred absent the conduct. To be a factual cause, the conduct must
> have been an actual, real factor in causing the harm, even if the result is
> unusual or unexpected. A factual cause cannot be an imaginary or fanciful
> factor having no connection or only an insignificant connection with the harm.
>
> To be a factual cause, Intertek's conduct need not be the only factual cause.
> *The fact that some other causes concur with Intertek's negligence in producing
> an injury does not relieve Intertek from liability as long as its own negligence
> is a factual cause of the injury.*

Doc. No. 247 at 21-22; *See also,* Id. at 32-33 for the same instructions on Defendant's

Counterclaims.

Because a "defendant is not relieved from liability because another concurring

cause is also responsible for producing injury," the verdict is therefore consistent. *Balter*

*v. United States*, 2014 WL 1365905, * 28 (M.D. Pa. 2014) (quoting Pa. SSJI (Civ), §

13.20); *see also*, *Jones v. Montefiore Hosp.*, 431 A.2d 920, 923 (Pa 1981) (quoting

*Majors v. Brodhead Hotel*, 205 A.2d at 878 (1965)) (plaintiff "need not exclude every possible explanation, and 'the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence.'"). Also, Defendant did not present any evidence showing how it was damaged by Plaintiff's Trademark Infringement. Instead, the facts presented at trial demonstrated that Plaintiff had a contract with Reecon and Reecon was an authorized listee of the Thermablaster with permission to affix its name on the heaters along with the ETL listing of Defendant. Because it is undisputed that Plaintiff was not an authorized listee, (see doc. no. 284 at p. 10) it was never authorized to affix its name to the product, only the name of Thermablaster and Reecon. The testimony, however, demonstrated to a reasonable finder of fact that Reecon, not Brand, affixed Brand Marketing's name to the ETL Listing. Yet, Intertek never sued Reecon for its central role in the Trademark Infringement at issue, and instead Intertek counterclaimed against Plaintiff. And, so, while the jury found that Plaintiff infringed Defendant's trademark, it found no damages (presumably because there was no evidence submitted of damages to the Defendant) and that the infringement was not willful.

There is nothing inconsistent in the jury's verdict, and even if there were, it is the duty of this Court to attempt to read the verdict in a manner that will resolve inconsistencies. *Mosley v. Wilson*, 102 F.3d 85, 91 (3d Cir. 1996)(citing *Los Angeles v. Heller*, 475 U.S. 796 (1986)). The Court will not exercise its "very limited discretion" in molding the jury's answers to special interrogatories. *McAdam v. Dean Witter Reynolds, Inc*. 896 F.2d 750, 763-64 (3d Cir. 1990). No new trial is warranted on the

40

basis of an inconsistent verdict.

**E.      The Court Will Exercise Its Equitable Discretion to Grant a Set-Off**

In the exercise of its equitable discretion, this Court may grant a set-off of a judgment held by a debtor against a judgment held by its creditor. *Prioe Bros, Inc. v. Proie*, 323 F.Supp. 503, 505 (W.D. Pa. 1971). As rehearsed, this Court granted Defendant's Motion to Amend its Answer and Counterclaim allowing Defendant to plead an equitable set-off based upon the judgment that it bought from Ace against Plaintiff in the fall of 2013. See Doc. No. 208

The Court may exercise jurisdiction and grant the set-off, even, where, as here, the judgment was purchased for less than its face value, unless the Court finds an injustice would be done in granting the set-off. *Id.* The Court will exercise its equitable discretion to grant the set-off in the amount of the judgment Intertek purchase from Ace. Plaintiff does not oppose Defendant's request.

**F**.      **There Was No "Undue Harm" to Intertek by the Introduction of the Assignment Relating to the Set-Off and No Evidence Presented of the Settlement Agreement Between ProCom and Plaintiff**

Defendant's last argument has two parts: both of which are unavailing, are not interrelated, and instead are based upon two distinct evidentiary rulings. Defendant argues that "the [C]ourt unduly harmed Intertek by refusing to allow evidence of Plaintiff's intentional violation of its competitor's patent, which was probative of credibility, while allowing Plaintiff to evidence Intertek's purchase of Ace's judgment against Plaintiff, which was irrelevant to any issue presented by the parties' competing claims or defense." Doc. No. 288. The Court will address each portion of Defendant's two point position in turn.

**(1)** **The Settlement Agreement between Plaintiff and ProCom Was Properly Excluded; And Defendant's Position That the Agreement Demonstrates Intentional Infringement Is Unsupported by the Record**

First, Defendant argues that this Court erred in not allowing evidence in the form of a settlement agreement between Plaintiff and former Defendant ProCom, which, if introduced, according to Defendant, would have shown that "Plaintiff *intentionally* infringed at least one of its competitor, ProCom's patents." Doc. No. 288 at 13. Plaintiff is quick to retort that nothing in the prohibited settlement agreement makes any reference whatsoever to the infringement being *intentional* and a review of the actual settlement agreement provides no support for Defendant's sweeping statement to that effect. Doc. No. 293; Doc. No. 61 (sealed settlement agreement). Accordingly, the first underlying premise of Defendant's argument lacks merit.

Boiling the base of Defendant's argument to its core, and giving Defendant the benefit of the doubt that what it *meant* to argue was that the Court improperly excluded the settlement agreement, despite the reality that the actual agreement mentions nothing of an intentional or willful infringement, a brief historical recitation is required.

To recount, on July 15, 2013, Plaintiff filed a Motion in Limine seeking to exclude the settlement agreement between prior party, ProCom and Plaintiff, under Fed. R. Evid. 408. On July 23, 2013, this Court granted Plaintiff's Motion in Limine after conducting a three page analysis and ultimately concluded that it would grant the Motion in Limine as a prohibited use under Rule 408, not subject to one of the short list of reasons that a settlement agreement may be offered into evidence. Doc. No. 137.

Defendant now argues that the settlement agreement establishes that Plaintiff intentionally infringed ProCom's patent. Accepting Defendant's argument as correct, the settlement agreement is still prohibited by Rule 408.

42

Rule 408 prohibits the use of settlement agreements "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Intertek argues that it should have been permitted to use Plaintiff's settlement agreement with ProCom for exactly the purpose for which its use is prohibited - - impeachment. The evidence at trial demonstrated that after ProCom filed a lawsuit against Plaintiff alleging infringement that Ace quit selling the heaters for some brief time, but ultimately put them back on the shelves. David Brand testified at trial that he had been sued by ProCom and that the matter "was resolved out of court." Tr. 3/4/14 p 64. Accordingly, even if Defendant were permitted to introduce the settlement agreement, there was nothing contained therein to "impeach" Plaintiff's prior testimony.

(2)     **Defendant Had No Objection to the Assignment of Judgment Being Introduced and Did So During Its Own Opening Statement, and Cannot Now Object to the Admission of This Evidence**

Nonetheless, Defendant now attempts in the second part of its argument, to posit that it was "unduly harmed" by above the ruling, and tries to connect the Court's ruling on the settlement agreement between ProCom and Plaintiff into an attack on the admissibility of its purchase of the Ace judgment. This is perplexing to this Court because Defendant itself repeatedly sought or agreed to make its purchase of the Ace Judgment part of the trial of this matter.

As discussed in the Procedural History (Section II), Defendant in its Response to Plaintiff's Motion to Amend the Second Amended Complaint, stated that "it is not opposed to introducing the fact of the assignment of judgment." Doc. No. 186 at ¶ 7. Defendant took the position that the amount of the default judgment Plaintiff owed to Ace, $611,060.45, was admissible and it was the subject of numerous stipulations of fact read to the jury (doc. no. 161 at

¶48-50).  Defendant also agreed that the fact of assignment of the judgment from Ace to Intertek was admissible and it had no objection to admission thereto.  Doc. No. 186 at ¶ 6.  Defendant argued that the actual settlement agreement between itself and Ace Hardware was not admissible because it showed that the amount Defendant paid for the assignment ($250,000.00) and should be excluded under Rule 408, and as irrelevant.  However, Plaintiff responded that it sought nothing more than to reference this fact of record, because if it was *not* permitted to introduce this fact, it could *not* truthfully express its damages to the jury.[16]  Plaintiff contended that because it was asking the jury to award money to it that will satisfy a judgment held against it, the jury must know the holder of this judgment.  The damage to Plaintiff is a judgment held by Intertek. Plaintiff argued "to tell the jury anything other than the fact that Intertek now holds this judgment would be untrue.  Finally, to withhold the true identity of the judgment holder will mislead the jury into believing the money they may award will go to satisfy the loss of an innocent party, Ace Hardware, when, in reality, it will inure to the benefit of Intertek."  Doc. No. 191.

The Court agreed with Plaintiff and entered a Text Order on September 6, 2013 (vacating its prior decision excluding such evidence), and allowed issues of the settlement agreement, the assignment of the judgment, and the judgment itself to be made a part of this action, including permitting the parties to refer to the fact that Defendant obtained an assignment of the Ace Hardware Judgment, and allowed the parties to conduct discovery thereon.  See Text Order of 9/6/13.

---

[16] Significantly, Plaintiff never sought to introduce, nor did it introduce the *actual* settlement agreement between Ace Hardware and Intertek. Therefore, neither the settlement agreement between ProCom and Plaintiff, nor the settlement agreement between Ace and Intertek were admitted;  instead, witnesses testified to facts surrounding both settlements, the only difference being the amount of the settlement was revealed regarding the set-off (for proper purposes), and no settlement amount was discussed regarding the infringement.

Next, Defendant filed an Amended Answer and Counterclaim wherein it included the assignment as both an Affirmative Defense and a Counterclaim. Doc. No. 211, ¶ 28, 51-58. Defendant also filed a Motion in Limine seeking to exclude the terms of the settlement agreement between Intertek and Ace only on the basis of Fed. R. Evid. 408. Doc. No. 222. On February 7, 2014, the Court issued its ruling denying said Motion as untimely and construing it as a Motion to Reconsider. Doc. No. 233. On February 24, 2014, Defendant filed a Motion to Reconsider the Court's rulings. Doc. No. 238. On February 25, 2014, the Court issued another Text Order denying Defendant's Motion to Reconsider and ruling that "this evidence is admissible and does not run afoul of Fed. R. Evid. 408, because it is not be used to prove or disprove the validity or amount of a disputed claim, or to impeach by a prior inconsistent statement, or contradiction." Defendant also filed a Notice of Its Assignment of Judgment, publicly, with the Court of Common Pleas of Allegheny County.

Perhaps most puzzlingly, Defendant then, *in its own opening statement*, affirmatively raised the topic of assignment and its buying of the judgment (and later the mediation process) before the jury. Defense counsel stated: "[w]hen we can't resolve with Brand, Ace and Intertek resolves the problem, resolves the issues. And the Intertek – the Ace judgment as a result of that agreement is assigned to Intertek." Tr. 3/3/14 p. 36-37. It is important also to note that Plaintiff did not reference this "resolution" during its opening statement, which occurred before Defendant's opening. Finally, Defendant called its own General Counsel at the conclusion of its case-in-chief, and asked him to testify regarding the mediation process, which was highly unusual and would seem to undercut Defendant's current position that it was against the introduction of such evidence. (see fn. 2 above for a recitation of the exchange in open court).

As Plaintiff posits, and this Court agrees, assuming for sake of argument that it could be characterized as part of a compromise, "one who introduces at trial evidence of a compromise offer waives any objection to its subsequent use." *Bohm v. Horsley Co. In re Groggel*, 333 B.R. 261, 297 (Bkrtcy. W.D. Pa. 2005) (citing *Shafter v. Bedard*, 761 S.W.2d 126, 130 (Tex. App. 1988), *Southern Railway Co. v. H.W. Vaughn*, 359 F.2d 424, 425 (5th Cir. 1966))(one who introduces at trial evidence of a settlement of a claim cannot later object to the use of such evidence). Moreover, admitting such evidence could not be reasonably construed as an undue prejudice to Defendant because there was more than enough other competent evidence upon which the jury could base its verdict, and therefore, did not taint the proceedings.[17]

## VI. Conclusion

This case has been a long and hard fought battle. Because numerous issues of fact precluded summary judgment as a matter of law, the Court preserved the rights of the parties to present their respective cases to the jury, in conformance with the deeply rooted constitutional mandates guaranteeing the right to trial by jury. *Bruckshaw v. Frankford Hosp. of City of Philadelphia*, 58 A.3d 102 (Pa. 2012) (The right to a jury trial in a civil action is a fundamental aspect of our system of law).

The jury performed its critical functions - - it observed the witnesses, heard their testimony, and judged their credibility, viewed the evidence and exhibits, and made the ultimate factual determinations in this case. Ultimately, the Court was not and is not the fact-finder in this case. Under the rigorous standards of review for Post-Trial Motions pursuant to Fed. R. Civ.

---

[17] To the extent that Defendant now attempts to argue that the evidence of set-off was "unduly prejudicial," despite the fact that it introduced it itself during its opening statement, it never raised any such argument during the pretrial or trial proceedings, rather it objected under Rule 408 and broadly based upon relevance. If it had, the Court would have conducted the required Rule 403 balancing test. *See Coleman v. Home Depot, Inc.* 306 F.3d 1333, 1344 (3d Cir. 2002)(holding that "any evidence that tends to harm a party's case must rise to the level of creating an unfair advantage for one of the parties for the evidence to be excluded under Rule 403.").

P. 50 and 59, the Court sees no valid reason to disturb the determinations of the jury.  Viewing the record as whole, and being careful not to engage in credibility determinations, this Court finds that the jury had more than the "minimum quantum of evidence," (rather it had ample evidence) upon which to base its verdict.  *Parkway Garage, Inc. v. City of Philadelphia*. 5 F.3d 685, 691 (3d Cir. 1993)(abrogated on other grounds).

In conclusion, there is no lawful reason to grant a new trial, or to reduce or eliminate the damages in this case (with the exception of the issue of equitable set-off).  The Court finds that that verdict was reasonable in light of the record, and remains so.  It would be a miscarriage of justice to disturb the verdict in this case.

For all of these reasons, Defendant's Post-Trial Motion (doc. no. 287) will be DENIED. An appropriate Order follows.

<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge


cc: All ECF Counsel of Record